# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| Ronald Benford, John A. Tarbert, Betty Martin, Irving Lackey, Candis McKelvy, Gregory Gordon | Case Type: Employment Dispute Court File No.: 10-cv-04539 ADM-LIB |
| *Plaintiffs*, | |
| *v.* | **PLAINTIFFS' MEMORANDUM OPPOSING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| The City of Minneapolis, Minneapolis Convention Center ("MCC"); et al. | |
| *Defendants*. | |

## <u>INTRODUCTION</u>

Defendants fail to meet their burden of proving summary judgment under Fed. R. Civ. P. 56 and their motion must be denied in all respects. Each of the six Plaintiffs brought timely claims under various statutes of limitation, some going as far as six years from the date of filing of the Complaint, others going back further due to the tolling effect of discrimination charges filed with government agencies. After a thorough and comprehensive discovery process including more than twenty depositions, document production of investigative findings where three branches of City Government themselves found discrimination against Plaintiffs Benford, Martin, McKelvy and Tarbert, Minneapolis decided to move this Court to dismiss the entire Complaint. To the contrary, the record contains a mountain of evidence which when viewed in the light

1

most favorable to the nonmovants, shows that Defendants have not sustained their burden of proving summary judgment as a matter of law.  Rather, each Plaintiff has raised genuine issues of material fact supporting their respective claims of race, color, national origin, age, gender, disability, religious and other types of discrimination and retaliation under federal, state and local statutes and civil rights laws.

Defendants' Motion is vague, conclusory and hypocritical, on the one hand arguing that the some of the events of discrimination in the Amended Complaint are "ancient," but on the other hand dredging up subjective incidents of discipline against each Plaintiff which are more than two years old and are time-barred under the Teamsters union contract and yet were used to illegally suspend or fire Plaintiffs.  This case would not be conducive to Summary Judgment even if the Court had granted Defendants' Motion to Enlarge its word count;  First there are a number of admissions, and the undisputed testimony of a severe and pervasive hostile environment with racial, age and gender-biased slurs, profiling and stereotyping of protected groups, openly retaliatory acts and remarks of supervisors and other *direct evidence* discrimination.  The Court could actually grant summary judgment for Plaintiffs on this direct evidence alone. Second, there are simply too many factual disputes relating to *indirect evidence* of discrimination:  the unequal work assignments, unequal discipline and harsh firings over trivial offenses, double standards in enforcement of work rules, and other terms and conditions of Plaintiffs employment.  Based on the above evidence Plaintiffs plan to

bring a motion to amend the Complaint to conform to the evidence, clarify and claims under Rule 15, and for punitive damages.

Whether it is pattern and practice evidence under Estes v. Dick Smith Ford, or issues of fact showing City policies and practices cause discrimination and constitutional violations, Monell claims, and Section 1983 claims, theories of direct evidence discrimination or in applying the McDonnell-Douglas test, Plaintiffs' have raised issues for trial sufficiently under Rule 56.  Defendants essentially ask the Court to rubber-stamp all the pretextual reasons the City and its all-white/European male management team, stated for discipline of the Plaintiffs, from reading a newspaper to "taking work breaks while black."  This ignores the fact that the City has the burden to produce a legitimate, nondiscriminatory reason for their actions in disparately disciplining Plaintiffs and terminating five of the six after each had filed internal and external reports of discrimination.  Contrary to Defendants' bald assertions, each Plaintiff has identified multiple similarly situated employees who were not treated this way or given the same discipline as Plaintiffs.  The deposition testimony filed herein, exhibits, affidavits and sworn interrogatory answers demonstrate that

A mountain of direct and circumstantial evidence exists that the City and its "white, good ol' boy network[1]" have treated Plaintiffs and other protected groups

---

[1] Managers such as Lane Carlson recognized the "good 'ole boy" hiring practices amongst the managerial staff at MCC, referring to is as the "Iowa connection" or the "Iowa Mafia," among other things.  Walsh Aff.; Carlson Dep. at 59; Tesfa Dep. at 115.

differently in virtually all the terms and conditions of employment including hiring, training, work assignments, work rules, work breaks, medical leave, use of equipment, respect in the workplace, civil service rules, union representation and collective bargaining rights, promotions, demotions, security and surveillance, property damage, investigations of theft or criminal activity, and the list goes on.

## FACTS

### I.    PRESUIT AND PROCEDURAL HISTORY

Christopher R. Walsh, counsel for Plaintiffs, has investigated these cases for more than six years and represents eight Plaintiffs who sued The City of Minneapolis (Minneapolis Convention Center).  Affidavit of Walsh Aff. ¶'s 4-6.  The current action comprised of six Plaintiffs sues the City as well as 14 people who are executives, managers, current and former supervisors who caused the racially hostile, gender-biased, aged biased work environment, unequally disciplined and terminated five of the six Plaitniffs.  See, Benford, the above-captioned case; Metcalf[2] v. City of Minneapolis, Inc., et al., U.S. District Court File No.: 11-3023 RHK/JSM;    and Henderson v. City of Minneapolis, et al., U. S. District Court File No. 12-cv-00012 DWF/LIM.  The lawsuits were filed at different times and assigned to three different federal court judges and magistrate judges.  The Metcalf matter was dismissed without prejudice.  The Henderson

---

[2] The Metcalf lawsuit was dismissed without prejudice on grounds that the Defendants were not served within 120 days of court-filing.  There was no res judicata or collateral estoppel effect, therefore John Metcalf, and possibly others, intend to serve and file a lawsuit under 42 U.S.C. Secs. 1981, and 1983 and other laws with longer statutes of limitation, than e.g. Title VII, in Hennepin County District Court.

case is pending.  Regardless of the status of the other Plaintiffs or charging parties, their sworn discrimination charges, and documentary evidence is relevant and admissible and will be cited to here.  The parties in this Benford case alone however provide the bulk of the genuine issues of material fact for trial.  The depositions of the six Plaintiffs were completed, including two sessions with Betty Martin.  Though Mr. Tarbert's deposition was cut short and Defendants claimed they would reconvene, they never did.  Never sent another Notice of Taking Deposition.  Thus, Mr. Tarbert supplements his deposition testimony with his attached Interrogatory Answers.

## II.    GENUINE ISSUES OF DISPUTED AND UNDISPUTED FACTS SHOW DEFENDANTS DISCRIMINATED AND RETALIATED AGAINST EACH OF THE SIX PLAINTIFFS.

### A. <u>The History Pattern and Practice of Discrimination and Reprisal at the City of Minneapolis, and Its Departments Especially the MCC.</u>

MCC has a history of white supervisors using an informal process to recommend their friends, family, college mates, and generally those of Caucasian ancestry, for jobs and promotions.  The white good ol' boy network or "Iowa mafia" management team is recognized by MCC supervisors and employees (including Plaintiffs) alike.  Zasada Dep. at 183.  Lane Carlson was aware of Plaintiff Ron Benford's concerns with the work environment at time of his initial complaint in the early 2000s.  Id. at 85.  He was involved in the investigation of Benford's claims, knew of the Probable Cause determination that was made, but disagreed with it.  Id. at 9, 93.  At that time, and following that time, Carlson supervised Ron Benford and Irving Lackey.  Id. at 132.

For example, Bryan Flaherty approached Don Moody and offered him a "detailed-in" janitorial crew leader position in May of 1996. Mr. Moody had not bid nor applied for the position, but Mr. Flaherty (white) asked if Mr. Moody would be interested in the opportunity. Moody Dep. SEALED at 17-18. A "detail" is a temporary assignment or promotion (Id. at 18-19), while a "bid" meant to apply for a specific schedule or work shift. Id. at 19-20. No posting or bid was allowed for this crew leader job, nor was a written application required. Mr. Flaherty, his boss Jim Norberg and Mr. Moody (three white males) just spoke about it informally and he got the job within ten days. Jobs and promotions just seemed to fall in the lap of "newbie" white employees and their girlfriends. Id; Van De Voort Dep. __; Perry Dep. __. Mr. Moody who admittedly had some reservations about his own qualifications and abilities:Moody Dep. 22-23, SEALED. Mr. Moody used the EAP and got counseling with some success, while in contrast Willie Henderson who has a race discrimination lawsuit, was sent to Anger Management, during the time Mr. Moody subjected him to progressive discipline. Whites who need or receive counseling, have mental health or chemical dependency issues are retained on the job, receive medication and counseling, or are even reinstated after smoking pot on the job like Don Moody. Id. at 131. Blacks who have, or are perceived to have mental health issues or disabilities are labeled as violent troublemakers, called "bitch ass niggah," "delusional," reported to police, strip searched, have their lockers searched and fired for good like Mr. Henderson. Id. at __; Carlos Dep. __; Langford Dep. __; Hicok Dep. __.

Minneapolis lacked any diversity training, training on discrimination, or training on Respect in the Workplace in the 1980's and 1990's either at the Auditorium or Convention Center.  Yang Dep. 59, __.  The City had a history of keeping minorities such as Kee Yang in part-time or probationary positions, with less work hours than whites who were hired later, such as Jeff Pohlad.  Yang Dep. 54-56.  The only American-born black male janitor who was promoted from within in Kee Yang's thirty years was Frazier Turner.  Yang Dep. 183-184.  Mr. Turner was also a ". . . good right-hand individual.  He doesn't argue with me.  He do the work I give him.  He get the work done on time to make me look good.  Make the department look good."  Id at 184-185.  So Mr. Yang recommended him for promotion.  Id.  Other people of color or protected groups, particularly those who engaged in protected activity, were mostly looking up through the glass ceiling such as Benford, McKelvy, Tarbert and ___.  Yang Dep.; McKelvy Dep. __; ___.  It is surprising to management if a fellow supervisor has signed or joined in his subordinates' petition or complaint of discrimination as Frasier Turner did when he signed the 2008 Complaint letter to the Star Tribune.  Yang Dep. 222-223;  Dep. Exh. 23.  Shift Supervisors say management should deal with discrimination in a different way— "[i]f I join the staff, which is this [gesturing to Dep. Exh. 23] – to complain about my boss—it just just doesn't look good."  Id at 223-224.  Management, and even Human Resources, has an unwritten "protocol" not to support any lower level or line workers' complaints of discrimination.  Yang Dep. __; Johnson Dep. __; Carlos Dep. __; Exhs. __ Regulatory Svcs. Report on "subdued" Human Resource department at MCC.  Genuine

issues of material fact exist that from shift supervisor up to executive director, the MCC will not investigate or discipline anyone for acts of discrimination and reprisal. They never have, but will sometimes reverse it as they did on Greg Gordon claiming after he was called the "n" word multiple times. Gordon Dep. __. "It just doesn't look right" for a Shift Supervisor to join OMS workers in their complaints of discrimination. Yang Dep. 224. So Kee Yang has never done it, even though he was demoted, denied a Senior Supervisor promotion, and believes he himself is a victim of discrimination. Many supervisors maintain this "code of silence." Id. at 224-225, ; Moody Dep. __-maybe there is discrimination against me, but not my subordinates; Tesfa Dep. __; Zasada Dep __;

This is the rare case where the Defendants themselves admit there is age, disability, national origin and race and gender discrimination. Yang Dep. In about 1994, the City excluded Kee Yang from Human Resources training which was given to non-Asians. Yang Dep. 72-75. He filed an EEOC charge, after keeping quiet about it for five years. Id at 75. He was hurt that numerous non-Asians got sent to the classes. All had better English and were not in need of the training as much as Yang, but Jim Norberg claimed he didn't need it. Mr. Norberg (white) apologized for having "overlooked" Mr. Yang. Id at 76-78.

After the Amended Complaint was served and filed naming Don Perry, and several other Shift Supervisors as Defendants in this lawsuit, some negative publicity occurred for the MCC including a newspaper article in the Star Tribune. Though the City

posted Jeff Johnson's note saying MCC never discriminated, Mr. Johnson and other authorities abruptly decided to eliminate all the Shift Supervisor positions.  Yang Dep. 113-114.  Only four Senior Supervisors would be kept.  Id.  Mr. Yang felt:

> discrimination and so hurt that I was the senior shift supervisor there and I wasn't hired.  And they hired somebody that had been on the job for nine months – oh I mean two years or one person that is not – has never been a supervisor.
>
>       I feel like I was discriminated too, but it is what it is.

Id at 115.  Mr. Yang plans to file a discrimination charge, complain to Human Resources or contact an attorney.  Id at 115-116.

Meanwhile, Benford, McKelvy, Tarbert and other minorities who aggressively sought promotions, better shifts and better or equal job assignments were denied.  Even in the recent restructuring, the interview process was a farce—the hiring panels, Marcus Travis, and others knew who they were going to hire as supervisors before the interviews began.  See Zasada Dep. at 129, 132.  The four individuals who were eventually hired—_____—were less experienced than other applicants.  See id. at 138.  This is just one example of how MCC management evaluated promotion candidates and employees on subjective terms and "played favorites."

Cite to Am. Cmpt. ¶\_, and corrob with deps Exhs.

After the Plaintiffs filed this lawsuit

### Ron Benford

Plaintiff Ronald Benford, is an African-American male, now 63 years of age, who was proud employee of the City of Minneapolis in some capacity for almost 25 years.

9

Benford Dep. 11, 19, 152, 209.  He had worked for Medtronic, a Control Data subsidiary, and then IBM in some Electronic Technician and technology jobs after graduating from Anoka Vo-Tech in 1978.  Id. at 15-19.  He first worked as a janitor for the Minneapolis Auditorium part-time in 1985 or 1986 while he held other jobs.  Id. at 19.  He progressed to full-time at the Auditorium and then worked at the new Convention Center building for nearly 19 years.  He began at the MCC on October 14, 1989 and worked full-time until the MCC fired him for reading a newspaper on June 9, 2008.  Id. at 20, 95, 188, 209-210. He worked all through the building in jobs such as Setup and Facilities.  MCC gave him acceptable performance reviews while he was in the Setup Department for fifteen years, and no serious discipline or suspensions.  Id. at 37.  Shift Supervisor Kee Yang called Ron Benford his "right hand man," meaning the "best guy on my crew."  Yang Dep. 177-178.  He worked for Yang on the day shift during a ten-year period from 1991 to approximately September 2001 and never aggravated or disappointed him.  Id.  During that time Yang trusted him to complete the workload and always got his daily work assignments done.  Id.  Benford never refused a work order, never asked Yang to give the Setup work to younger or less senior worker. Id. at 179.  Nor did he tell Kee Yang he felt discriminated against based on Yang's work assignments.  Id. 179-180.  None of the pretextual discipline for, *e.g.* reading a newspaper, unauthorized work breaks, overextending breaks, was handed out by Mr. Yang.  Though Yang gave Benford one coaching or oral reprimand in about the week of 9-11,the two did not hold a grudge and joked about it.  Id. at 181-182.

Benford would occasionally read the newspaper at work, when his tasks were complete. Moody Dep. 121-122.  No supervisor said Ron Benford failed to complete his work tasks or disciplined him for poor or sloppy work in twenty years.  Moody Dep. Id.;

Mr. Benford's last job title was Operations Maintenance Specialist ("OMS") (Id. at 21).    Around the year 2003, he was fed up because the managers and Senior Supervisors they inserted in the Setup Department weren't qualified, didn't know what they were doing and "basically didn't know what was going on"  Id at 26-27;  Moody Dep. _.  Jack Barr, Kurt Hicok and Greg Langford were not taking care of business and Mr. Benford didn't like the way he was being treated.  Id, ___.  The endemic problems of discrimination had been going on for years.  There are barriers to entry for younger minorities (Yang Dep. 54-60, __,) and illegal early exit programs for the older, the disabled, women, and people of color.  There is a "glass ceiling" at the MCC.  Benford Dep. 191;  Yang Dep. 220-222.  Other than Greg Langford, there is no "black representation in the management level" and Ron Benford rose his hand and complained about it at an all staff meeting.  Id.  It took time, but Defendants built a pretextual file to terminate him in retaliation for all Benford's civil rights reports.  There has never been a person of color in positions like Production Services Manager (Jack Barr), Facilities Operations Manager (Lane Carlson);   Facilities Services Senior Supervisor (Randy Rasmussen) in twenty years.  Benford Dep. 193-194.  No Asians, Hispanics or African-Americans had held a position above Shift Supervisor in Ron Benford's departments during his employment.  Id.  Nobody could work their way up, not even Kee Yang who

was there longer than Benford.  Yang. Dep. at 30-31, __.  Only Dale Biske and Darrel Eck, two Caucasian employees Building Maintenance Worker's ("BMW's") have more seniority than Mr. Yang.  Id.  Mr. Eck has no apparent disabilities.  Id.  In December 2011, Mr. Eck received a pin and award for 35 years of service at MCC (and the Minneapolis Auditorium).  Mr. Benford, Ms. McKelvy and other Plaintiffs never got that chance.

Mr. Benford had a commercial driver's license the whole time he worked at MCC. Id at 143.  The City discriminated in its drug testing and discipline of blacks for drug or alcohol use compared to whites.  Id at 143-145.  It was supposed to be doing "random" drug testing for the commercial drivers but Mr. Benford was getting tested every month or every other month.  Id.  Jack Barr even re-hired Don Moody back into a Shift Supervisor position after Moody was caught on the security cameras smoking marijuana with his subordinates or coworkers.  Id at 144-145.  Mr. Benford was one of several minorities and co-workers who signed a petition in about 1997 complaining of the hostile work environment and "being harassed by upper management."  Id at 145; Walsh Aff., Benford Depo. Exh. 6, September 30, 1997 Letter to Mayor Sayles Belton, et al.  Plaintiff Benford wrote the petition himself and collected signatures from his coworkers and people that agreed.  Id.  White co-workers such as Dale Biskey and John Zasada signed and agreed with the petition.  Yet the City has never, ever admitted it discriminated to this day.  If you don't admit a problem, you can't fix it.  The concerns stated in the petition were not rectified even though many City Council members, politicians and even

the head of the MCC, Anthony Lopez were copied with the 1997 petition. Most of the blacks, women, Natives and other protected class members who signed that 1997 petition, including Plaintiffs Ron Benford, Candis McKelvy, Jay Tarbert were ultimately fired.

Mr. Benford had the seniority to bid and transfer over to the Facilities Department in 2003 and worked there on the day shift the whole time. Id at 26-28. Though he got in there it was an all-white retaliation environment. At MCC, the only one of the six Plaintiffs named herein that Randy Rasmussen supervised was Benford, though John Metcalf did work under him for a brief period while he was on light duty assignments. Rasmussen Dep. at 71. Although he was a white supervisor, Rasmussen was subject to a measure of the same nepotism that the "Iowa mafia" exhibited when he was passed over for a supervisory position to which he had applied and for which he was qualified in favor of the cousin of his supervisor, Linda Boursell (1990-1994). Rasmussen Dep. at 48, 51, 55. As mentioned, Rasmussen supervised Ron Benford at MCC and was involved in disciplinary action against him. Although Benford had no notable performance issues and had a favorable history of documented review at MCC, he was written up and ultimately terminated based on Schoeben's report that Benford was reading a newspaper when he was not technically on break. Id. at 128. At his deposition, white male supervisor John Zasada candidly described a similar instance where he picked up a newspaper at a time he was not on break and read an article thereon for a period of eight

to ten minutes. Zasada Dep. at 183-84. Candis McKelvy reported the incident and not a thing was said about it. Id. at 183.

The pattern of disparate discipline, however, goes beyond disparate treatment for like conduct. For example, Mike Schoeben received what Rasmussen described as a "friendly coaching session" after he directed a racially disparaging term—"boy"—at Ron Benford; he was asked to apologize and was not disciplined in any way. Rasmussen Dep. at 137, SEALED; see also Zasada Dep. at 28 (coaching is not discipline). Defendants' contention that "boy" is merely a phonetic descriptor (Carlson Dep. at 73) does erase the derogatory undertones—Randy Rasmussen even acknowledged that "the term 'boy' (as it was used) could be offensive to an African American." Rasmussen Dep. at 136. Benford, on the other hand, was formally disciplined and terminated for doing something that Zasada was permitted to do: similar reports of "reading a newspaper;" disparate forms of recompense.

Benford was a dues-paying union member, number three (3) on the seniority list under a collective bargaining agreement with the Minnesota Teamsters Public and Law Enforcement Employees Union, Local No. 320 ("Teamsters Local 320") at the time MCC fired him. Lane Carlson was never disciplined for reading a newspaper, and there were no policies at any job he ever had against reading the newspaper while at work. Carlson Dep. at 33-34. In the context of his other supervisory roles, he knew of nobody who was disciplined for reading a newspaper or being out of work area, and did not know of anybody who received discipline for over-extending breaks and or taking breaks too

early.  Id. at 38.  At MCC the break policy did not dictate where exactly employees needed to be; they were not required to take breaks only in the break room.  Id. at 42.  On at least one occasion, an employee reported that John Zasada had been reading a newspaper on the job (8-10 minutes), yet he nor any other white supervisors, managers, or employees had been disciplined for doing so.  Carlson Dep. at 118; Zasada Dep. at 183-84.  Although there was no specific policy against it, Plaintiff Ron Benford was disciplined and eventually terminated for reading a newspaper under the same circumstances as Zasada.

### Irving Lackey

"If you are made aware of racist comments you have to report them."  Carlson Dep. at 118.  From a supervisory standpoint, the alleged protocol when observing a violation of respect in the workplace policy is to "address it immediately."  Carlson Dep. at 171.  The disparate treatment and unequal discipline developed further in 2005 when Greg Langford told Don Moody that supervisors were to begin enforcing the "out of the workplace" policy, which they had never enforced before.  Moody responded that they could not just start because that wasn't their practice, but Langford replied: "just start enforcing it."  Carlson Dep. at 96.  Yet MCC employees including Plaintiffs had become accustomed to "unspoken policies" such as the varied work assignment policy that supervisors adhered to, moving people around to different jobs on a day-to-day basis.  Carlson Dep. at 174.  Supervisors frequently assigned certain African American OMS workers to the worst jobs.  Irving Lackey was consistently given bathroom cleaning

duties; Ron Benford was tasked with "grunt work" such as cleaning highly elevated surfaces and other work that was inappropriate for an employee with his level of seniority.  Even disciplinary and termination procedures were inconsistent: whereas Lane Carlson reviewed Irving Lackey's employee file during the process of his termination, Ron Benford was given no such review.  Id. at 187-88.

The pattern of favoritism in promotions and hiring procedure as described herein was not only pervasive throughout the MCC managerial staff, but it even extended beyond.  Jack Barr, for instance, was not awarded a Senior Supervisor position after the 2012 restructuring; he did, however, slide into a position as a project manager for the Target Center Projects within a few months of the elimination of his position at MCC. Carlson Dep. at 146, 149.  He still has an office in the Convention Center next to Lane Carlson.  Id.

Tesfa testified that he has been subject to race and national origin discrimination at MCC. He has had issues with other supervisors and managers such as Lane Carlson, who ignored numerous emails he sent expressing a desire to provide MCC supervisors such as Duane Currie with diversity training because he noticed unequal treatment of whites and employees in protected classes.  Tesfa Dep. at 30-31, 79.    Currie, for example, would "check in on" Tesfa's sick leave reports and tell Lane Carlson he was abusing the FMLA system without confirming or disconfirming the reason for the leave (in one instance, a doctors's appointment).  Id. at 79-80.  Currie would also check Mr. Tesfa's work after his shift ended and would report to Lane Carlson, often fraudulently, tasks that were not

complete.  Id. at 85.  He also did this to Abdu Mohammed and Frazier Turner, both of whom are also dark-skinned and of African descent.  Id. at 85.

Tesfa and the Oromo community (Ethiopian nationality) are currently raising money to hire a lawyer and pursue a discrimination case against MCC on behalf of Mr. Tesfa; he has already filed charge with MDHR.  Tesfa Dep. at 31.  His specific allegations corroborate the allegations of the Plaintiffs herein: MCC supervisors and managers failed to promote Mr. Tesfa, who has a litany of experience in facilities management.  When he applied for the Guest Services management position, MCC General Manager Jeff Johnson hired a friend from one of his former places of employment, Xcel Energy.  Id. at 37-38.  Tesfa was overlooked again when he applied for the Director of Security position, which was given to another one of Jeff Johnson's Xcel Energy friends.  Id. at 40-43.

The Guest Services position only entailed the supervision of three to four employees each day—a number well below the ninety employees he supervised at the Washington Convention Center.  Id. at 45.  Jeff Johnson explained to Mr. Tesfa that he was "not qualified" for the position.  He stymied further conversation on the matter except to state that the failure to promote was not race-based.  Id. at 45-47.  Higher paid and higher ranking positions, however, are almost always awarded to whites.  See id. at 107.  This mirrors the mechanics of the "Iowa Mafia," where 'friend' means more than 'professional.'  Tesfa Dep. at 115.  All told, Mr. Tesfa was employed for 11 years at MCC without any promotions, a grim comparison to his employment history at the 1700-

room hotel in St Louis where he received a promotion every year without even applying. Tesfa Dep. at 113.

In his role as a supervisor, Azrat Tesfa spoke out against disciplinary actions that were discriminatory.  For example, at some point after the 11-13 supervisor positions were eliminated Lane Carlson instructed Tesfa to write up an African American employee, Charles Ellison, for allegedly no cleaning bathrooms he had been assigned to clean. Tesfa Dep. at 34.  Tesfa had checked the bathrooms and found the clean during his shift, and declined to issue the discipline because the allegations were false.  The two exchanged several emails before Carlson dropped the issue.  Id. at 34-35.  Tesfa's colleagues, including Carlson, told him that he "wasn't collaborating" with their actions because he didn't issue the false discipline.  Id. at 32-33.  On another occasion, Lane Carlson allegedly saw Irving Lackey smoking in Hall B.  He told Mr. Tesfa he had to "write up" Lackey, and Tesfa replied that he didn't witness it and asked if Carlson was implying he should lie on the discipline form.  Id. at 144-45.  Carlson finally wrote a discipline report and had Tesfa to sign it—although he didn't witness the conduct, the report was technically made by Lane Carlson.  Id. at 145-46.  MCC later used the write-up to terminate Lackey.  Tesfa Dep. at 145.

Yet Mr. Tesfa prescribed to the general trend that even though he believes he was discriminated against, he would not done so against Mr. Lackey his subordinate.  The facts and discrimination charges show a different story.  Plaintiff Irving Lackey is a 60-year-old African American from East Chicago, IN, who moved to Minneapolis in 2000 or

2001.  Lackey Dep. at 11.  He served in the United States Marine Corps and was honorably discharged from service in San Diego, CA, in 2001, before which he performed a variety of labor and maintenance jobs which afforded him a broad background in the kind of work he eventually would perform at MCC.  Id. at 26-38.  Plaintiff Lackey was inducted into a six-month training program at the Convention Center during 2001, and began work early in 2002.  Id. at 39, 42.  He was hired as an Operations Maintenance Specialist ("OMS") worker in the facilities division for a 2:30-11:00 shift during which his primary duties included cleaning 19 bathrooms, stocking janitor closets, assisting with the main lobby (which consisted of cleaning bathrooms and stocking janitor closets), and other various duties.  Id. at 42-44

Irving Lackey worked primarily under Supervisor Azrat Tesfa, who wrote him up for "basically anything."  Lackey Dep. at 55.  Lackey describes his relationship with Tesfa as similar to a "white-and-black issue," but a "black-and-African issue."  Id. at 57.

On November 14, 2003, Mr. Lackey had complained to his supervisors Asrat Tesfa and Frazier Turner about unequal treatment based on his sex and race with respect to a female coworker Susan Stauffer.  Lackey was about to take his lunch in the break room and another OMS worker advised him that a main lobby bathroom needed to be cleaned.  Lackey Dep. at 120.  Ms. Stauffer was in the break room talking with Mr. Tesfa, and Plaintiff Lackey related the bathroom complaint to Tesfa and Stauffer, noting that she was the person assigned to that bathroom at the time.  Id. at 120-121.  Tesfa told Irving to do it, to which he responded with frustration because Susan was sitting right there and

Tesfa had told him to do her job.  Tesfa said that Irving would be fired if he did not.  Id. at 121-123.

On another occasion Mr. Lackey went to lunch and forgot to turn his radio on when he returned.  Id. at 124.   He was made aware of the fact that his radio was off when a coworker notified him that his supervisor had been trying get in touch.  Id.  An Ethiopian woman hired by Azrat Tesfa, Esther, frequently forgot her radio and other employees had to bring it to her.  Id.  Esther never got in any trouble for any of her transgressions while Mr. Lackey was suspended for the one occurrence.  Id.  at 124-125.  Azrat Tesfa also misrepresented a particular verbal confrontation between he and Irving Lackey that was interrupted by Frazier Turner—Tesfa wrote up Mr. Lackey and indicated in his report that Mr. Turner had to restrain Mr. Lackey during the confrontation, suggesting that he was "reaching" and "throwing up hands."  Id. at 127.  Lackey testified that there was no physical altercation whatsoever.  Id.  At the same time whites, and non-protected class members engaged in the same or similar "violations" of the collective bargaining agreement, but were not disciplined, suspended or terminated like Plaintiffs.

### Betty Martin

Plaintiff Martin first became employed by Defendant Minneapolis on February 10, 1991.  Martin Dep. at 24.  After fifteen years of service, MCC terminated her on March 24, 2006, allegedly for taking an "unauthorized smoke break."  Id. at 25.  MCC had generally rated Martin's job performance as satisfactory from 1991 until 2005.  Plaintiff Martin worked in OMS Housekeeping and got along well with her supervisors including

Nancy Luer and Jim Norberg, who initially hired her.  Martin Dep. at 32-33.  She passed her six-month probationary period, became a member of the Teamsters union, and a permanent employee on or about August 27, 1991.  Ms. Martin worked as part of MCC's Maintenance/Janitorial team under a number of different supervisors including Ross Kegel, Bryan Flaherty, and Jim Norberg.

During the first five years of her employ at MCC, Plaintiff Martin overheard Ross Kegel and another white supervisor make racist jokes and use racial epithets on five occasions.  Martin Dep. at 48.  Ms. Martin was aware of the "Respect in the Workplace Policy" that MCC had in place through the training it offered.  Id.  Yet Betty Martin is a quiet, soft-spoken woman—this kind of disparaging racial commentary overwhelmed her, and the thought to reporting or complaining about the things she witnessed made her fearful of reprisal.  Id.  Ms. Martin also witnessed disparate treatment toward women during this period: for example, on one occasion in approximately 1992 a supervisor instructed Candis McKelvy to pull a dolly-like cart stacked with what Ms. Martin estimated to be around forty (40) tables.  She was expected to do this without the use of a Cushman, a motorized vehicle that is generally used to pull loads such as this, but several other white employees were using it and she had to pull it by hand.  Id. at 42-45.

In 2001, MCC reorganized its workforce, and Ms. Martin's became an Operations Maintenance Specialist ("OMS") in the Setup Department.   Her job responsibilities shifted from a janitorial and "housekeeping" role to a setup and preparatory role.  Id. at 32-33.  Supervisors often instructed Ms. Martin to perform many of the jobs she had

previously assumed before moving to the setup department. Ms. Martin observed supervisors assigning disproportionate amounts of work to females while giving men easier work. Id. at 54. Like the racist remarks of Mr. Kegel, this conduct had the effect of "chilling" Plaintiff's willingness to speak out against the unfair and disparate treatment since she needed to keep her job and feared that she would lose it if she spoke out against it. Id. at 54-55. The only way she felt she could avoid reprisal and disparate job assignments was to keep her head down and go along with it. Id. at 55.

Over the course of her employment, Ms. Martin was also subject to "write-ups" for minor incidents which many other employees such as the white friends of MCC Supervisors or the Ethiopian parish members of Azrat Tesfa could get away with and more. Betty Martin was identified in an internal Investigation Summary as one of three females who were subject to unfairly harsh discipline as compared to male employees. See Defendant Dep. Exh. 127, 125.

Zasada was employed at MCC as a shift supervisor beginning in August 2003 up until 2012, at which point his job was eliminated due to what Jeff Johnson called "communication and trust issues" between the employees and supervisors. Id. at 23, 25. When MCC had interviews for supervisor positions after the 2012 "restructuring," John Zasada's position was eliminated, and he was effectively demoted from supervisor to CAS operator. Id. at 92. Zasada contacted HR and the interview panel to remind them that he had dyslexia. He requested an opportunity to read questions (if any) beforehand, and that if he had to write anything it might take a while. Id. at 122-23, SEALED. He

also mentioned that he wanted to take notes.  Id.  He communicated these needs by emailing Bonnie Zelanski, Marcus Travis, and Archie Carlo; Ms. Zelanski confirmed that she would notify panels, but she never told anybody as she had promised, and Mr. Zasada was not granted the accommodations he requested. Id. at 103, SEALED.  Zasada believed that disability played a part in the elimination of his job.  He also believed that his complaint about the interview panels and his later involvement in the Benford, Metcalf, and Henderson lawsuits.  Id. at 118, SEALED.

Even before he interviewed for the newly created positions, Marcus Travis told Zasada he wasn't going to get a senior supervisor job.  Zasada Dep. at 129.  And despite MCC's failure to recognize or accommodate Zasada's disability, he interviewed for one of the four positions along with 17 other MCC employees.  Id. at 92.  The three separate interviews took only 45 minutes in total, though he had anticipated they would last several hours.  Id. at 126.  Echoing earlier statements, after the interviews Marcus Travis told Zasada he was going back to CAS, adding "if you don't get the job" when he realized he had let 'the cat out of the bag.'  Id. at 132.  Zasada eventually retained counsel for MCC's failure to promote, as he believed that the more-qualified supervisors did not receive the available positions.  Id. at 88, 138.  Though Zasada states that it's none of his business if the City is okay with the 'good ole boy' hiring practices, his retention of counsel following a serious of dubious hires seems to suggest otherwise.  Id. at 183.

Having an educational background in "organizational communications, multicultural communication, speaking of culture communication, and nonverbal communication,"

John Zasada created a communication-themed PowerPoint presentation for the MCC staff supervisors.  Zasada Dep. at 26.  This he did on his own volition, and he presented to the Production Services staff and the CAS staff; first in either 2007 or 2008 and again in 2009.  Id. at 26-27.  The presentation did not cover formal complaints of discrimination, but it did cover "coaching," which is not disciplinary but rather a written agreement between employee and supervisor for the purpose of establishing expectations.  Id. at 27-29.  MCC does not have a written policy regarding whether coaching is disciplinary, though Greg Langford stated to Zasada that it is not.  Id. at 29.  Yet the point at which coaching becomes or gives rise to formal discipline is unclear (see id. at 29-30) and opens the door to disparate application and disparate discipline such as what the Plaintiffs herein experienced.

Although Zasada's background in communication and his litany of experience in supervisory roles, leadership roles, and positions of trust and responsibility are a credit to his character, he still lacks an understanding of certain types of discriminatory conduct.  Zasada Dep. at 95-97.    For example, at his deposition, Mr. Zasada was unsure whether he had ever heard about "disparate impact discrimination."  Id.  With such a diverse staff, MCC managers and supervisors are incompetent to prevent or avoid certain types of discriminatory or disparate conduct if they are not aware that it exists.  By a combination of deliberate, negligent, and uninformed conduct, employees such as the six named Plaintiffs herein were made to endure disparate and discriminatory conduct amounting to

illegal employment discrimination under the laws of Minnesota and the United States of America.

### **Greg Gordon**

Shift Supervisor Don Moody handed out daily job assignments to Mr. Gordon and others on the __ shift. , such as the hard job of picking up stuff in the hall and putting it at that particular time straight into the garbage truck. Gordon Dep. at 16. These were some of the hardest jobs. At that particular time Setup and Cleanup (now Facilities) were combined. Moody would always pick the black people to go into the hall and do the messy job of picking things up off the floor and filling up the garbage truck. The better less dirty jobs, just go in the rooms and set them with the equipment and stuff, Moody would always give to the whites. Id. at 17. Mr. Gordon is a big strong man and he had no problem moving and setting tables, chairs, or any other equipment. Gordon Dep. __, __. When Greg Gordon started working for MCC in 1999 he had a one-year probationary period. They were given very little training, except just watch others but nobody was assigned to train them in. Id at 46. MCC gave training on City policy and Procedures about once per year for "a couple of weeks" when Gordon started in 1999. Id at 48, cf Carlos Dep, __; __. But the training was whittled down to one day per year. Id. at 48. In year 2000 they split teams to one responsible for Clean-up/Facilities and ones responsible for Setup. Id. at 49. Gordon started taking notes in1999 when he saw that blacks were being fired left and right. Id. The supervisor, Don Moody, had a policy of sending all of the people that were white to Setup, which everybody felt was a better job. Id.

Q: Why do you think it was better?

A: Because when you go into the hall, if you come behind a food show, you had rats running around and mice. You had literally food on the floor. You would have to pick it up with gloves. They would give you gloves. You would have to pick it up. At that particular time the way you did it you throw it directly in the garbage truck. You would throw it in the back of it, boxes, whatever. They had The Hardware Show. Then they have The Home & Garden Show where it was bricks you would have to throw in there.

Id. at 49-50. Gordon expressed his opinion to Moody about the way he was giving out jobs, but nothing was done. Id. at 50. Gordon spoke to Barb Kaiser, Don Moody and Blues Bland and complained about Don Moody's discriminatory behavior and asked to have the tasks split more evenly. Id. At 52. But there management never addressed his concerns about unequal job assignments and would just "brush it off." Id.

In 2000 Gordon had a meeting with Gary Hart, Greg Langford and Jack Barr complaining about the discrimination. Id. at 53. Shortly thereafter he was targeted. Different supervisors (Don Moody, Carrie Van DeVoort) were coming in his room watching him work. When he changed to night shift Jack Barr and Don Perry come in the room and observed him working. Before Gordon's complaint supervisors were just making their rounds and briefly stopped by and continued. Id. at 55, SEALED.

Kee Yang sees that there are more people of color on the night shift than the day shifts, but claims it is not management forcing them work such shifts. 189-190. Rather, he asserts that seniority and bidding rights control this. Id. But Gordon was forced to go to night shift to try and get away from the unequal discipline and scrutiny from white management. Gordon Dep. __. Meanwhile, whites like Dale Eck, Dale Biske, Gary

Fricke, Gary Bishop, John Zasada, Don Moody, Don Perry, Carrie Van DeVoort were able to bid on day shift and stay employed at MCC even though they had less seniority than many of the Plaintiffs.  Yang Dep. 189-90.

### Candis McKelvy

Don Moody was an OMS worker with less seniority than Candis McKelvy or Betty Martin during the time they worked together on the 11:00 p.m. to 7:00 a.m. shift in the Set Up Department.  Moody Dep. **SEALED** p. 23-24.  Yet the City "detailed in" Mr. Moody crew leader above them.  Id.  Mr. Moody

Yang was aware of some of McKelvy's discrimination charges, or the facts surrounding them. Yang Dep. 272-273; Dep. Exhs. 29, 31-32.  But he denied Mr. Langford's concerns about Candis were related the charges.  Id. at 2449-250.

Most of the people who signed the 2008 discrimination letter (Dep. Exh. 23) including McKelvy, Willie Henderson __ were subsequently fired.  Yang Dep. 225-230; __.  Mr. Henderson like Ms. McKelvy was fired on the subjective pretext of "discourtesy" or "disrespect." Yet when asked few supervisors could give concrete examples of any such behavior by the Plaintiffs or Mr. Henderson.  Yang Dep. 226-229. After 19 years of loyal service to the City, and despite the protection of the Civil Service Rules, McKelvy was fired just before here PERA pension would vest.  Mr. Yang and MCC fired her, not for putting a cart in the doorway, but for ". . . the behavior that she was mumbling in front of the client . . ." and saying 'This is Sandy (phonetic) hectic.  I

don't believe'-- And she was saying that and the client was very close by, and she was trying to organize the meeting." Id at 230-231.  Ironically, Mr. Yang mumbles himself, and can't pronounce the word "insane."  Id.  Greg Langford in his (Langford Dep. 189-190) and they were "soft-spoken" and very hard to understand at times during their depositions even though they were 3-4 feet away from the questioner, and even closer to the notary and recording equipment.  Id.  No one bothered to check if the customer actually heard what Ms. McKelvy was mumbling or if it offended the woman.  Id;  Yang Dep. 233.

Mr. Yang didn't make the decision to fire a 20-year employee, for mumbling, but he supported it.  Yang Dep. 233-234.  Yang and MCC management had stereotypes that good workers, especially minorities and women, should keep quiet about discrimination.  Id. at 234.  When hurtful things happened that he thought were discrimination, sometimes he complained but more often he just kept quiet about it.  Id.  Candis McKelvy was a more vocal personality and spoke up for her rights.  Id at 234-235.  She complained more than Kee Yang did and he believed she was grumbling and griping her whole career.  Id.  But the evidence and the chronology does not bear this out.  She went 13 years without being called discourteous, disrespectful or disciplined for any of the pretexts later used to fire her.  Dep. Exh. __ Discrimination Charge dated __.  Though in theory, Plaintiffs had the right to file civil rights complaints if supervisor managers did something unfair (Yang Dep. 235;  __) in practice it did not work that way;  Id. at 235, 239.  In practice supervisors did not like the way she complained of unequal work assignments, and

believed she should have said, "Kee, here's a record . . ." comparing last week's work assignments, young people, white people, etc.  Id.  Interesting, but the law only requires good faith complaints for McKelvy to be protected from retaliation;  it did not require to keep records of Shift Supervisor assignments, her to take her supervisor aside privately during group work assignments, to use a softer tone, to go immediately to Human Resources, or to have a personality like Kee Yang or the whites.  Id. at 236-237.  It wasn't so much that Yang disagreed with what McKelvy was saying in the concerns she raised, it was her male bosses' perception of the way she did it.  Id at 236;  Regulatory Services Investigation at __.  McKelvy had been called a "black bitch" twice, a more direct slur for an assertive woman of color.  Id;  McKelvy Dep. __; Exhs. __.  Just as whites and males have cultural stereotypes about blacks and females, Laotians such as Mr. Yang, do also.  Id at 239-240.  Through Mr. Yang's cultural lense, he interpreted McKelvy's complaints entirely differently than she did;  Id.  He does not know America's history of slavery, racism, segregation or who Rosa Parks was.  Id at 241.  He understands that to tell a group of blacks to get to the back of bus is very offensive.  Id.  But did not receive any training from Minneapolis on how to handle, report or investigate complaints of discrimination.  Id at 242, __.  He essentially considers her civil rights complaints "bad behavior" and consulted with Messrs. Langford and Hicok to "retrain" her.  Id at 242-243.  Ms. McKelvy never admitted she was discourteous, because she was acting in good faith, assertively and passionately complaining about unequal work assignments.  Id at 244.  When no one would listen the nice way after several complaints

through all channels over fifteen years she was more vocal one day about having to use dirty dishes that had not been washed. Defendants have repeatedly used the excuse that because Greg Langford is black and he approved of or was involved in the discipline it could not be discriminatory. Yang Dep. 244-245. The law does not so state. The law protects Plaintiff from an employer which has a special unwritten protocol that discrimination complainers are disrespectful and fired, while whites like Hicok, Perry, Van DeVoort and Moody who yell and threaten others are actually rewarded for it.

**Jay Tarbert**

John J. Tarbert is an African-American male, 46 years old, born in the United States. Tarbert Dep. 14-16. He has twelve children, including two boys under the age of two. Id. After graduating high school, he had been employed in restaurants, as a cook or in janitorial jobs. Id. He got a job in Minneapolis at the old Musicland store on Hennepin Avenue. Id. at 16-17. Mr. Tarbert started there as a janitor and worked there about six years rising to the level of Assistant Manager as Musicland. Id. Greg Langford had also worked "undercover" at Musicland for a company called Commercial Reports. Langford Dep. at 68-69. He was kind of a dual employee, paid by Commercial Reports to be an Investigator, but also paid by Musicland to work a particular shift. Id. Racial slurs, jokes, derogatory remarks about African Americans "there were some alleged things of that nature" at Musicland and Mr. Langford was hired by Commercial Reports to determine if there were some of those allegations going on, "along with I believe there was some employee theft or something that was happening there too." Id. Though he

denied "spying" on employees Mr. Langford, worked there undercover for only three months with the knowledge of Musicland Human Resources and his other employer who both paid him to write these reports.  Id. at 69-70.  Apparently, Mr. Langford was not interested in a career at Musicland, but had more of a background in Security and was taking some type of private investigator course at that time.  Id. at 71-72.  He had no training on racial profiling, diversity or cultural sensitivity at that time.  Id.  When he was an informant for Commercial Reporting, Mr. Langford was investigating theft of videotapes, like movie videotapes.  Id. at 246.  He denied using video surveillance or getting minority employees terminated.  Id. 246-247.  Though he was hired specifically to make reports, he denied making reports.  The head of HR for Musicland believed the thief was an employee of Musicland who was stealing, but Mr. Langford's investigation was "inconclusive."

In contrast, the investigation at MCC did conclusively show four white employees robbing a vending machine.  Caught white-handed, Dale Biske, Darrell Eck, Toni Dellwo and another light-skinned employee, were not suspended or terminated.  Similarly, Don Moody had smoked pot on the job, and was hired back.

Greg Langford is African-American, about 6 feet tall, and is black belt in one type of martial arts, Tae Kwon Do.  He had also worked many years in Security, and had to restrain people in bars using his martial arts training.  Id. at 76-77, and there's not many people who can intimidate him physically.  Id. at. 75-76.  He has never felt threatened by any of the six Plaintiffs in this case or by Willie Henderson.  MCC has a policy of

escorting terminated employees from the building with a guard escort.  Id. at 78.  But the policy is not in writing.

THIS PAGE OF PLAINTIFF'S MEMORANDA IS SEALED AS IT CONTAINS ARGUABLY CONFIDENTIAL INFORMATION FROM THE "ATTORNEY'S EYES ONLY" SECTION OF THE DON MOODY TRANSCRIPT.  Don Moody supervised Ms. McKelvy, and "at times" Ms. Martin and Mr. Tarbert 3-5 years ago on the 11:15 a.m. to 8:00 p.m shift.  Moody Dep. **SEALED** p. 31-32.  Mr. Moody has at one time or another supervised all six of the Plaintiffs.  Id. at 33.  None of the Plaintiffs caused Mr. Moody stress, where he needed some assistance.  Id. **Sealed**.  However, his supervisors may have treated Mr. Moody differently based on him filing for FMLA, but he doesn't know for sure.  Id.  **Sealed** at 80.  Mr. Moody volunteered that though the City was accommodating him, "I think Kurt [Hicok], Greg [Langford] and Jack [Barr] are not very good at their jobs and I have concerns about how they've done different things at times." Id.  Mr. Moody himself former shift supervisor admits that he may have been discriminated against based on his disability, and Messrs. Barr, Langford and Hicok may have been incompetent in the way they handled his FMLA leave.  Id. at 80-88.

> I got the impression that sometimes when I took my FMLA leave, they felt that they were being inconvenienced, and they felt that -- I got the impression that it seemed, at times, they did not think that my use of leave was legitimate and I was doing it specifically under the FMLA umbrella to make their life more difficult.  That's the impression I got from them at times.

Id. at 88.  During times when Mr. Moody came back from a medical leave, Mr. Hicok was upset, out of sorts and "short" with Don Moody.  Id. at 89.  Similarly, when Mr. Moody had filled out the paperwork and doctor's orders to put in for FMLA in the late 90's, his boss Ken Gay said, "Why don't you just use sick leave?"  Mr. Moody nonetheless asked about his FMLA rights, and as Grade 3 OMS worker, knew more about them than Mr. Gay Grade 9.  Id. at 92-93.  Mr. Gay was not only an idiot and incompetent about FMLA rules, but also when Mr. Moody would ask him a question.  Id. at 94-95.  He would say, "Hmm, let me get back to you . . ." and it would be "some time later."  A genuine issue of material fact is raised that Messrs. Barr, Hicok, Langford and their predecessors were more than just "incompetent" bad bosses when they treated a disabled person asking for FMLA this way.  This was a pattern of the City failing to train, counsel or discipline its supervisors and executive to prevent discrimination.  The unequal treatment, and disability discrimination and retaliation which these same men displayed toward Don Moody, one of their hand-picked supervisors, was worse toward the disabled Plaintiffs in this lawsuit.  Gordon Dep. Lackey Dep. McKelvy Dep. ____

Mr. Tarbert has complained to management about violations of the nepotism policy.  For example, he complained to Jack Barr and Kurt Hicok that Don Moody and Carrie Van DeVoort, who supervised on the same crew, were in a romantic relationship and lived together.  Cf Moody SEALED Dep. 29, 34-5.  Nepotism creates problems particularly when management has an "all-white" structure as does the MCC; one white supervisor ends up hiring, promoting, or "voting with" the other white family member in

matters of discipline and discrimination.  Jay Tarbert complained of this as a type of discrimination to Jack Barr, Kurt Hicok and others.  See, Walsh Aff., Exh. _--Plaintiff Jay Tarbert's Answer to Interrogatory Nos. 2.  Subd. 19 re Carrie and Don.

Three to five years ago when Mr. Moody and Ms. Van DeVoort were supervising the Plaintiffs, the two were "involved" or dating.  Moody Sealed Dep. at 34-35.  The related supervisors collude, aid, and abet each other in discriminating and retaliating against minorities who complain such as Jay Tarbert.  MCC has been criticized by its own regulatory services department for the way it uses dual supervisors.  Carlos Dep. _; Dep. Exhs 125:

> The dual supervisor structure was found to persist at every level within the Convention Center. During the investigation, it was evident that this structure provides problematic communications between management staff and ultimately creates periodic confusion within the management structure and that of employees in terms of personnel management and record retention. It is particularly a concern when both shift supervisors sign everything, but in reality, only one observed the behavior in disciplinary incidents.

**Investigative Report Supplement, Discrimination Complaint, Betty Martin,** **_Operations Maintenance Specialist, Convention Center-Set-Up_**, From Clara Schmit-Gonzalez and J. Rich Profaizer, Regulatory Services, To Human Resources Director, et al, p. 1.  Exhibit 125 is smoking gun evidence of the environment of direct gender discrimination against Ms. Martin, Candis McKelvy and others.  It also points out the dual supervisor role is causing problems.  Mr. Tarbert and others complained that the dual supervisors were created by Anthony Lopez basically so white managers from Iowa

could hire and create more jobs for their white buddies.  Dep. Exh. __, Letter to ___. This is the "white good ol' boy network" in action which Defendant Moody himself described.  Moody main Dep. __.

Mr. Moody and some other supervisors were refreshingly honest about the endemic discrimination even they faced and experienced.  Mr. Moody admitted that the Employee Assistance he sought related to personal issues he was experiencing in his relationship with Ms. Van DeVoort in 2007-2009.  Moody sealed Dep. 33-35.  There are genuine issues of material fact that if the nepotism policy had been enforced against this white couple, or against Don Perry and Val Sweeny, or against Greg Langford and his paramour Christie Currie, the African and Native American "brothers" and "sisters" (Plaintiffs) may not have not have been set up and terminated when they questioned this version of white authority.  Mr. Moody's main issues were what he called "personal concerns with my relationship, which was with Carrie."  Id. at 35.  The evidence suggests it was not just "personal" but also work-related because the two worked on the same shift from the mid-2000's to the end of 2010 and they were both shift supervisors.  Id. at 35-36.

The City of Minneapolis Department of Civil Rights failed to subpoena or request the surveillance tapes of the Jay Tarbert alleged property damage incidents, the Willie Henderson incidents, and many others.  This is suspicious and inconsistent.  In other cases, involving non-city respondents, the MDCR has criticized when those accused of discrimination disposed or tampered with evidence:

> Finally, the investigation determined that *Respondent tampered with evidence*. Respondent asserted that it was common practice to erase surveillance tapes every two weeks and that there was no recording on the surveillance tape from April 18 – the date of the incident. However, a former employee interviewed stated that he viewed the video shortly after the incident and further stated that the Respondent may have disposed of the tape or failed to release the tape to the department.

*Case Accounts*, Velma J. Korbel, Director, Issa Abdallah v. Marathon Gas Station, MDCR File No.: 09-13046-PA-1A-2, Close Date: April 15, 2011 (Emph. Added). In Abdallah a white gas station attendant beat up and threatened a black Muslim customer with a gun, and made racial slurs. Eyewitness accounts were used to rebut the missing video evidence, which had been viewed by an ex-employee before it was destroyed. The MDCR adopted the view of the evidence which was exculpatory to the customer. Here, to the contrary, Minneapolis, despite a request from Mr. Tarbert and the union, let seven hours of surveillance tape "expire" even though it could have exculpated Mr. Tarbert and assisted the finders of fact. Travis Dep. Vol _, p. __; Hicok Dep. __. Instead, Greg Langford and Mr. Hicok took selective photos after Mr. Tarbert was gone, and blamed for the alleged damage to bleachers and a wall in Exhibit Hall E.

To date there is not a single piece of physical evidence specifically linking Mr. Tarbert as the cause of any damage to the bleachers or Exhibit Hall E. Nor has MCC produced any "before and after" photos to prove the damage did not pre-exist July 7, 20__, when Mr. Tarbert, Ghobena Bushura, Chad Leverson, __ had all been working in that room.

Genuine issues of material fact exist that the property damage was already there before Mr. Tarbert began work on __, that Defendants had been waiting for several years for a pretext to fire Plaintiff, and that they exaggerated or fabricated the mysterious "damage" and scapegoated Jay Tarbert for it.  Regardless, even if Mr. Tarbert accidently caused some damage, it was disparate discipline to fire a 17-year-employee for it.  The inconsistent policies and training on the use of forklifts with bleachers show pretext.  Many employees have used forklifts to retract, expand or move bleachers without discipline or correction by Kurt Hicok, Sheldon Drew, or Steve Egan.  In fact on the date in question, Messrs. Drew and Egan, watched Mr. Tarbert, Mr. Bushara doing their work off and on for seven hours in this familiar method.  If using the forklift was so dangerous and destructive, why did someone not correct Mr. Tarbert or train him on the proper method?  Because they badly wanted him fired.  Badly enough that Kurt Hicok had shouted right in front of the H.R. Generalist, pounded on tables and windows, risked his own career by being discourteous and disrespectful, all to get his man.  Hicok Dep. __. Dep. Exhs. __, __.   Badly enough that they would destroy exculpatory evidence, ignore eye witness testimony, and threaten, "I don't see you working here much longer."  Badly enough that Kurt Hicok did let his ego take a back seat, become a note-taker, and let Greg Langford sign and deliver the termination letter.  Hicok Dep. _; Langford Dep. __.

Mr. Hicok claimed that he was not retaliating or discriminating, but that Jay Tarbert was "playing games."  Messrs. Hicok and Perry brought Plaintiff to tears, but he never lost his cool.  They knew they couldn't get him on discourtesy or threats or like

they got McKelvy and Henderson.  So used the pretext and yes, double standard, of property damage.  White people never got fired for property damage, but no matter, let's build it up to $25,000.  Ridiculous and not legitimate to claim these 25-year old bleachers were damaged that badly by Jay Tarbert.  No repair invoice has been provided, nor was a consistent explanation ever given of timing, cause, nature and extent of the alleged damage.  Marcus Travis, of Guest and Security Services, never looked in person at the alleged property damage in Exhibit Hall E.  Travis Dep. Vol. I, p. 52.  But he was "made aware" of the termination.  Id.  MCC notified him of the property damage and he looked at it on video surveillance.  Id.  Plaintiffs conducted a Rule 34 entry upon land and inspection of things on May 11, 2012 and Mr. Travis was there as one of our escorts.  Id. at 52, __.  With our security expert John Burnett, and Jay Tarbert present, we took video and photographs of the bleachers in Exhibit Hall E, the surveillance cameras, walls and other items.  Id.;  Videotape DVD at _ to __.  Later Plaintiffs also went inside the CAS room to look at some of the television monitors and "feeds" from the surveillance cameras in Hall E.  Id. at 52-53.  There are two cameras hanging from the ceiling on white wires or vertical pipes.  Id. at 53.  And there is a camera positioned above each of the two "drive-throughs" or large archways where vehicles and equipment can be moved. Id. at 53-54;  Inspection DVD's.  In our inspection Plaintiffs' looked at live feeds from all four of those cameras in Exhibit Hall E.  Id.  There are two more cameras near the dockwell rollup doors.  Id.  The inside cameras are pan, tilt and zoom ("PTZ").  Id.;  Exh.

__--Inspection DVD's.  The cameras fixed to the wall above the drive-through bays can catch a moving vehicle coming through those east-west rollup doors.  Id. at 56-57.

No mechanic was consulted or called to testify at the predetermination or union grievances.  Nor did Defendants identify a "bleacher expert" to explain their convoluted theories of how Mr. Tarbert is guilty of this mass destruction of property.  Defendants have the burden on summary judgment of proving no issues of genuine material fact as to the elements of each of Plaintiffs' claims.  Here again MCC fails.  Multiple inferences are raised that the true motive for termination was not preventing or punishing property damage.  It was to fire a 17-year employee who had been a "discrimination-thorn" in the side of management for years.  Management celebrated when Mr. Tarbert was gone, because he was a cool-headed, articulate, civil rights advocate for himself and others.

## III.    DEFENDANTS' INCORRECT VIEW OF THE FACTS

Defendants succinctly state their incorrect view of the facts at pp. __ to _ their memorandum, and incredibly claim there are no disputed genuine issues of material fact .  We set out certain of defendants' factual contentions in italic font below, and expose their many inaccuracies.

## ANALYSIS

## IV.    A. SUMMARY JUDGMENT STANDARD

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Id. at 323; Enter. Bank, 92 F.3d at 747. A party opposing a properly supported motion for summary judgment

may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). On a Motion for Summary Judgment, the Court views the facts in the light most favorable to the nonmoving party, here the six Plaintiffs. Davison v. City of Minneapolis, 490 F.3d 648, 651 (8th Cir. 2007).

Summary judgment should be used sparingly in the context of employment discrimination because such cases often depend on inferences rather than direct evidence. Crawford v. Runyon, 37 F.3rd 1348, 1341 (8th Cir. 1994). Here, the Plaintiffs sets forth specific facts through multiple pieces of evidence in the record, including depositions, documents and investigative findings of the City itself. The record clearly presented here sets forth "specific facts showing that there is a genuine issue for trial." See Fed. R. Civ. P. 56(e).

A. **Defendants' Motion for Summary Judgment is Premature Discovery Could Not Be Completed Relating to All Twenty-One Parties to this Lawsuit in the Month Period Allowed, Evidence is Being Withheld. Therefore, Fact Issues Cannot Be Fully Analyzed and a Rule 12 Standard Should Apply.**

The showing a Plaintiff makes at a Rule 12 motion to dismiss hearing is very light. Indeed, direct evidence is not even required at trial. Desert Palace, Inc. v. Costa, 539 U.S. 90, 93 (2003) (circumstantial evidence is sufficient proof of discrimination to obtain a mixed-motive jury instruction at trial). Here, Plaintiff sufficiently pleaded both direct and circumstantial evidence under Title VII, 42 U.S.C. § 1981, 1983, ADEA, MDAA, MHRA, and other claims. Deposition testimony must be taken on all the claims pleaded

40

and some of it may show direct evidence of discrimination or admissions against interest by a decisionmaker. See, e.g., <u>Kokes v. College</u>, 148 S.W.3d 384 (Tex. App. 2004) (Where employer testified applicant "probably could be better at doing the job than [ 65-year-old Plaintiff] because she was younger" court denied summary judgment, held witness was competent to testify, and statements were direct evidence of age discrimination). Thus, to dismiss any claims now before all depositions are completed would be premature.

The general rule is that summary judgment should be denied when the party opposing summary judgment comes forward with specific facts challenging the credibility of the movant's evidence. <u>Corrugated Paper Products, Inc. v. Longview Fibre Co.</u>, 868 F.2d 908, 914 (7th Cir. 1989); <u>Rand v. CF Industries, Inc.</u>, 42 F.3d 1138, 1146 (7th Cir. 1994) (specific facts that raise significant issues of credibility);

**B. <u>All of the Plaintiffs' Claims Are Timely.</u>**

See, <u>Woodson v. Intern. B'hd. Of Electric Workers</u>, 974 F.Supp. 1256, 1262 (D. Minn. 1997).

**C. <u>There are Genuine Issues of Material Fact Concerning All the Plaintiffs' Discrimination Claims Based on Race, Color and National Origin Protected Factors</u>**

Both MHRA and 42 U.S.C. § 1981 claims rely on federal law and the elements of proof for a national origin/race discrimination claim under Title VII and  the three-part test established in <u>McDonnell-Douglas Corp. v. Green</u>, 411 U.S. 792 (1973); <u>Sigurdson v. Isanti County</u>, 386 N.W.2d 715 (Minn.1986);  See also, St. Mary's Honor Center v.

Hicks, 509 U.S. 502, (1993).  Defendant admits the four to six year statutes apply on most of the claims of discrimination under Section 1981 and 1983.

Under the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) Mr. Ortiz has proven (1) he is a member of a protected group-- Hispanic male, (2) that adverse employment actions were taken against him–disparate treatment, termination of his second shift job, disparate discipline–Donatelle forced him off of second shift when he told the truth, while it gave Ms. Wilson no discipline for lying about, discriminating and retaliating against a co-worker and (3) a causal connection between membership in the group and the adverse employment action–being singled out by white co-worker and white upper level management for a four-month campaign of harassment Ortiz Dep.

The Plaintiff may prove discriminatory intent by either direct or circumstantial evidence.  Goetz v. Farm Credit Services, 927 F.2d 398, 400, 55 FEP 462 (8th Cir. 1991); Coffman v. Tracker Marine, 141 F. 3d 1241, 1245 (8th Cir. 1998).  Job reassignment after protected activity can be a retaliatory, adverse employment action.  See, Bradley v. Widnall, 232 F.3d 626 (8th Cir. 2000).

Age cases & Time limit issues:  Yates v. Rexton, Inc., 267 F.3d 793, 799 (8th Cir. 2001).  It is well settled that the Minnesota Dismissal for Age Act--Minn. Stat.  181.81 et seq., has a statute of limitations which runs at least two years from the date of the last discriminatory act.  Portlance v. Golden Valley State Bank, 405 N.W.2d 240 (Minn. 1987); Lecy v. Sage Company, 460 N.W.2d 102 (Minn. App. 1990)(citing Kyllo, 723 F.

Supp. 1332, 1337). This lawsuit was first filed in November 29, 2010, thus the MDAA direct action claims here go back at least three years to November, 29, 2007, against the individuals due the intentional and willful age discrimination.

Here, the nonpayment or reduction of compensation was continuous, willful and deliberate, as it was the result of intentional discrimination and retaliation. Am. Cmpt. ¶s 307, 309-310, 319, Prayer for Relief, Cl. E, p. 111. Plaintiffs clearly have alleged a continuing and willful violation of the ADEA, the MHRA, and the MDAA and other civil rights laws. Id. See the Facts section above for the interrogatory and deposition testimony which states the prima facie case of intentional discrimination. The aiding, abetting obstruction and all discrimination alleged was continuous and willful: "Defendants continued to retaliate against Plaintiffs even after termination of employment by opposing Plaintiffs' attempts to receive benefits, retirement, pension rights, grievance and union arbitration rights, unemployment benefits and other adverse action." Am. Cmpt. ¶ 329. The discrimination and retaliation Counts of the Amended Complaint cite many willful acts by Defendants, creating a fact issue as to whether a two or three-year statute of limitations applies to the MDAA claims here. Am. Cmpt. ¶ __, Tarbert Interrogatory Answers at ____.

**Prima Facie Case of Discrimination Under The MHRA**

Plaintiffs all brings disparate treatment, discipline, and retaliation claims, like the plaintiff-appellant in Kim v. Nash Finch Co., 123 F.3d 1046 (8th Cir. 1997). The motion must be denied.

**WALSH LAW FIRM**


Date:  September 25, 2012          By:  /s/ Christopher R. Walsh (#199814)
                                        100 South Fifth Street
                                        Suite 1025
                                        Minneapolis, MN 55402
                                        (612) 767-7500
                                        *Attorney for Plaintiffs*