# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Ronald Benford, John A. Tarbert,
Betty Martin, Irving Lackey,
Candis McKelvy, and Gregory Gordon,

       Plaintiffs,

    v.

The City of Minneapolis, Minneapolis
Convention Center ("MCC"); Jeff Johnson
individually and in his capacity as Assistant
City Coordinator and Executive Director of
the MCC; Lane Carlson, individually and in
his capacity as Facilities Operations
Manager; G. Jack Barr, individually and in
his capacity as Production Services
Manager; Kurt Hicok, individually and in
his capacity as Production Services Sr.
Supervisor; Carrie Van DeVoort,
individually and in her capacity as Shift
Supervisor; Gregory Langford, individually
and in his capacity as Event Operations Sr.
Supervisor; John Zasada, individually and
in his capacity as Shift Supervisor; Don
Perry, individually and in his capacity as
Shift Supervisor; Don Moody, individually
and in his capacity as Shift Supervisor; Kee
Yang, individually and in his capacity as
Shift Supervisor; Azrat Tesfa, individually
and in his capacity as Shift Supervisor;
Mike Schoeben, individually and in his
capacity as Shift Supervisor; Randy
Rasmussen, individually and in his capacity
as Facilities Services Senior supervisor;
Gregory Hintz, individually and in his
capacity as Shift Supervisor,

       Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 10-04539 ADM/LIB

Christopher R. Walsh, Esq., Walsh Law Firm, Minneapolis, MN, on behalf of Plaintiffs.

Gregory P. Sautter, Esq., Darla J. Boggs, Esq., and James A. Moore, Esq., Office of the City Attorney, Minneapolis, MN, on behalf of Defendants.

## I.  INTRODUCTION

On October 16, 2012, the undersigned United States District Judge heard oral argument on Defendants the City of Minneapolis, et al.'s (collectively, "Defendants") Motion for Summary Judgment [Docket No. 57].  Plaintiffs Ronald Benford, John A. Tarbert, Betty Martin, Irving Lackey, Candis McKelvy, and Gregory Gordon (collectively, "Plaintiffs") oppose the motion.  For the reasons set forth below, Defendants' motion for summary judgement is granted.

## II.  BACKGROUND

### A.  Overview of Plaintiffs' Claims

Plaintiffs are current and former employees of the City of Minneapolis (the "City"), each of whom worked or are working in different capacities at the Minneapolis Convention Center ("MCC").[1]  Stated in broad terms, Plaintiffs allege that Defendants engaged in employment discrimination, retaliation, and the implementation of discriminatory practices and policies in violation of various federal, state, and local laws.  Plaintiffs belong to different protected classes and each Plaintiff has independently pursued administrative relief for their own claims.

---

[1]  Plaintiffs named the MCC as a separate defendant in this action, but the MCC is not a legal entity separate from the City.  See, e.g., Minneapolis, Minn. Code of Ordinances ("M.C.O.") § 21.20 (2012) ("The [city] coordinator shall coordinate city activities as directed by the city council and shall supervise . . . the Minneapolis Convention Center, and such other activities as the city council may direct.").  The City is the proper governmental defendant. Thus, the MCC will be addressed only as a facility operated by the City.

Nevertheless, Plaintiffs jointly allege discriminatory actions based on race, national origin, religion, age, disability, and gender. Because the employment histories, applicable laws, and identified protected classes vary between Plaintiffs, the Court addresses each Plaintiff's background and claims individually and in greater detail in Section III.G, below.

**B. Procedural Posture**

On November 12, 2010, Plaintiffs Benford, Tarbert, McKelvy, Martin, and Lackey filed their original complaint. Complaint [Docket No. 1]. In the original complaint, Plaintiffs alleged eight counts of discrimination in violation of several federal and state laws against the City, the MCC, and ten individual defendants. See id. On January 14, 2011, Plaintiffs filed the First Amended Complaint (the "Amended Complaint"). [Docket No. 4]. The Amended Complaint added Plaintiff Gordon and Defendants Tesfa, Schoeben, Rasmussen, and Hintz to this action. See id. It also supplements Plaintiffs' factual allegations, but leaves Plaintiffs' legal claims unaltered. See id. In the 112-page Amended Complaint, Plaintiffs take a scattershot approach to alleging discrimination, often alleging multiple types of discrimination, against multiple protected classes, at once. See, e.g., id. at ¶¶ 311-314.

As the Court held in a prior order, Plaintiffs' counsel Christopher Walsh has repeatedly failed to comply with the Federal Rules of Civil Procedure (the "Rules") as well as the District of Minnesota Local Rules (the "Local Rules"). See Order [Docket No. 70]. For instance, Plaintiffs never properly served the original complaint on Defendants. Plaintiffs eventually served the Amended Complaint, but only after Magistrate Judge Brisbois required proper service or dismissal of the action. [Docket Nos. 5, 8-14, 16-22].

Plaintiffs' counsel's compliance with procedural rules did not improve over the course of

discovery.  Unlike Defendants, Plaintiffs did not serve timely Rule 26(a) disclosures.  Order

[Docket No. 62] ("Disc. Order") 3-5.  Mr. Walsh also failed to appear at the pretrial scheduling

conference, "without notice or excuse."  Id.  In addition, Plaintiffs did not respond to

Defendants' discovery requests until months after responses were due, and then offered only

incomplete answers and failed to produce documents.  Id. at 3.  With regard to expert discovery,

Plaintiffs Benford and Martin identified three experts nearly two months after the expert

disclosure deadline had passed.  Id. at 8.  As of July 30, 2012, seven months after the expert

disclosure deadline, Plaintiffs had still failed to disclose their experts' putative opinions.  Id. at

10.

　　　Given these circumstances, Defendants brought a motion to compel discovery and

exclude the testimony of Plaintiffs' expert witnesses.  Defs.' Mot. Compel Disc. and Exclude

Experts [Docket No. 35].  Judge Brisbois granted the motion, in part because of Mr. Walsh's

multiple, inexcusable violations of the Local Rules and "total lack of diligence" in expert

discovery.  Disc. Order at 23.  Judge Brisbois also denied Plaintiffs' own discovery motion,

citing Plaintiffs' numerous and egregious violations of the Rules.  See id. at 12-23.

　　　Plaintiffs misleadingly sought review of Judge Brisbois' Order as a "Report and

Recommendation," and then filed an "objection" to the Order with this Court.  Obj. to Disc.

Ruling [Docket No. 63].  In his objection, Mr. Walsh improperly attempted to seek various forms

of affirmative discovery relief.  See id.  This Court overruled Plaintiffs' objection and affirmed

Judge Brisbois' ruling.  Order [Docket No. 70] 3.  It further cautioned Mr. Walsh to review the

Minnesota Rules of Professional Conduct.  Id.

## C.  Defendants' Present Motion

On July 15, 2012, Defendants brought this Motion for Summary Judgment against Plaintiffs, seeking dismissal of all counts brought against them.  Mot. Summ. J. [Docket No. 57].  In response, Plaintiffs filed a memorandum and over four thousand pages of deposition testimony and exhibits.  See Pls.' Mem. in Opp'n [Docket No. 72] ("Pls.' Opp'n"); see also Christopher Walsh Aff. Exs. [Docket Nos. 75-80, 84].[2]

Plaintiffs' memorandum is rife with incomplete sentences and blank citations to the record.  Some of the citations which Plaintiffs chose to complete refer to irrelevant deposition testimony or documents, or to only a single page from a larger passage of relevant testimony.  Although the Court has attempted to locate relevant portions of the record on its own, the task of sifting through several thousand pages of documents to support Plaintiffs' claims is not the Court's function.  The Court will not advocate for Plaintiffs by mustering the evidence and making arguments when their counsel has neglected to do so.  See Northwestern Nat'l Ins. Co. v. Baltes, 15 F.3d 660, 662-63 (7th Cir. 1994) ("District judges are not archaeologists.")

On October 16, 2012, just 20 minutes before oral argument on Defendants' motion, Plaintiffs filed a Motion to Strike and Supplement the Record ("Motion to Supplement").  [Docket No. 85].  In the motion, Plaintiffs request additional discovery under Rule 56(d) and the opportunity to supplement the summary judgment record.  Id.  Plaintiffs also request that the Court strike Defendants' Reply in Support of Summary Judgment and declare certain exhibits as

---

[2]  Plaintiff Tarbert filed his responses to Defendants' interrogatories as an exhibit to Plaintiffs' summary judgment memorandum.  Walsh Aff. Ex. 38 [Docket No. 79].  The Court declines to consider discovery responses issued nearly two months after Judge Brisbois' Order and four months past the discovery deadline.  Fed. R. Civ. P. 37(d).

not protected by the Protective Order.  Id.  Plaintiffs incorrectly filed the attachments to this

motion, including Mr. Walsh's Rule 56(d) affidavit, and to date have failed to correctly re-file

the attachments.

## III. DISCUSSION

### A.  Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall

be rendered if there exists no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.

The United States Supreme Court, in construing Federal Rule 56(c), stated in Celotex

Corp. v. Catrett, 477 U.S. 317, 322 (1986):

> In our view, the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a party who
> fails to make a showing sufficient to establish the existence of an element
> essential to that party's case, and on which that party will bear the burden of proof
> at trial.

On a motion for summary judgment, the court views the evidence in the light most

favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

However, the nonmoving party may not "rest on mere allegations or denials, but must

demonstrate on the record the existence of specific facts which create a genuine issue for trial."

Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

If evidence sufficient to permit a reasonable jury to return a verdict in favor of the

nonmoving party has been presented, summary judgment is inappropriate.  Id.  However, "the

mere existence of some alleged factual dispute between the parties is not sufficient by itself to

deny summary judgment . . . .  Instead, 'the dispute must be outcome determinative under

prevailing law.'" Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citation omitted). Moreover, a plaintiff facing a summary judgment motion cannot "get to a jury without any significant probative evidence tending to support the complaint." Rath v. Selection Research, Inc., 978 F.2d 1087, 1091 (8th Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). In addition, "summary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint." Krenik, 47 F.3d at 959.

The United States Supreme Court and the Eighth Circuit Court of Appeals have held that district courts should not "treat discrimination differently from other ultimate questions of fact." Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (citations omitted). There is no "discrimination case exception" to the standard for summary judgment, and courts should not treat plaintiffs alleging discrimination with particular deference. See id.

**B. Several Statutes At Issue Do Not Allow Individual Liability**

Defendants correctly argue, and at oral argument Plaintiffs conceded, that 42 U.S.C. § 2000e, et seq. (Title VII) does not allow liability against the individually-named Defendants, each of whom are or were municipal employees (the "Individual Defendants"). Spencer v. Ripley Cnty. State Bank, 123 F.3d 690, 691-92 (8th Cir. 1997). However, several other statutes at issue also do not allow individual liability. The Age Discrimination in Employment Act (ADEA) and the Americans with Disabilities Act (ADA) do not attach liability to individual employees. See Alsbrook v. City of Maumell, 184 F.3d 999, 1005 n.8 (8th Cir. 1999) (regarding ADA); Herrero v. St. Louis Univ. Hosp., 929 F. Supp. 1260, 1266 (E.D. Mo. 1996) (regarding ADEA). The Minnesota Human Rights Act (MHRA) allows liability against employees for

aiding and abetting violations, but liability for direct violations of the statute is only allowed against "employers."  See Iyorbo v. Quest Int'l Food Flavors & Food Ingredients Co., No. 03-5276, 2003 WL 22999547, at *3 (D. Minn. Dec. 19, 2003).  The Minnesota Dismissal for Age Act ("MDAA") and the Minneapolis Civil Rights Ordinance (MCRO) do not allow individual employee liability for the same reason.  See Arens v. O'Reilly Auto., Inc., --- F. Supp. 2d -----, 2012 WL 2856071, at *2 (D. Minn. 2012); M.C.O. § 139.40(b).

The only remaining statutes at issue that allow individual liability are 42 U.S.C. §§ 1981 and 1983, and the aiding and abetting provisions of the MHRA and MCRO.  Each of these causes of action is addressed below with regard to the Individual Defendants.  All other claims will be considered as pleaded against the City alone.  Also, Plaintiffs allege numerous violations of federal, state, and local laws in a haphazard and "laundry list" manner.  Each of Plaintiffs' claims are reorganized here for the sake of clarity.

## C.  Plaintiffs' § 1983 Claim (Count 1)

### 1.  The City

Under § 1983, a plaintiff may sue a city for a deprivation of constitutional rights if the City took formal action to cause the deprivation.  A formal action, or policy, is one that "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the City's] officers."  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).  In addition to an officially adopted policy, liability may attach to a City for constitutional deprivations that result from "custom," even though the City may not have formally approved the custom.  See id.; see also Kuha v. City of Minnetonka, 365 F.3d 590, 603 (8th Cir. 2003), abrogated in part on other grounds, Szabala v. City of Brooklyn Park, 486 F.3d

385 (8th Cir. 2007).

Eighth Circuit courts have consistently recognized a difference between a city's official "policies" and its "customs." Absent an official policy, a plaintiff must identify a "custom or usage" that caused the alleged violation. See Kuha, 365 F.3d at 603-04. A "custom or usage" is demonstrated by:

> (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the city's employees;
>
> (2) deliberate indifference to or tacit authorization of such conduct by the city's policymaking officials after notice to the officials of that misconduct; and
>
> (3) the plaintiff's injury by acts pursuant to the governmental entity's custom, i.e., proof that the custom was the moving force behind the constitutional violation.

See id. at 603-04 (citing Jane Doe A v. Special Sch. Dist., 901 F.2d 642, 646 (8th Cir. 1990)).

Here, Plaintiffs allege Defendants, through "unlawful policies and practices," subjected Plaintiffs to harassment, discrimination, and retaliation in violation of the Fourteenth Amendment. Am. Compl. ¶¶ 289-91. But Plaintiffs do not identify any formal policy in either the Amended Complaint or in their summary judgment memorandum that they allege caused their termination, alleged harassment, or alleged lack of advancement.

Plaintiffs instead argue that unofficial City customs or practices caused persons belonging to protected classes to receive disparate work assignments and to rarely receive promotions. However, Plaintiffs offer only anecdotal support for this argument in the form of personal observations, such as Plaintiff Gordon's observation that the City fired employees "left and right," "most" of whom were African-American. See Walsh Aff. Ex. 3, Gregory Gordon Dep. [Docket No. 76] ("Gordon Dep.") 49; see also Walsh. Aff. Ex. 2, Ronald Benford Dep. ("Benford Dep.") 191-97 (testimony regarding personal recollection of disparate promotions).

Throughout their memorandum, Plaintiffs also intersperse seemingly unhelpful testimony from Defendants. For example, Plaintiffs cite Defendant Yang's testimony regarding observed promotions of women and persons of color. See Walsh Aff. Ex. 30, Kee Yang Dep. [Docket No. 78] ("Yang Dep.") 183-87. But Yang offered no conclusion regarding whether the number of promotions he observed were uncommonly low, or the result of discrimination. See id. Plaintiffs also cite the testimony of Defendants, including Yang, who felt discriminated against themselves. See id. at 54-56, 115-116; Ex. 20, Asarat Tesfa Dep. ("Tesfa Dep.") 37-47.

Perhaps most problematically, Plaintiffs make potentially relevant arguments without supporting them with evidence of record. In several instances, Plaintiffs argue the existence of a discriminatory practice but fail to complete a citation to the record. See, e.g., Pls.' Opp'n at 7, 22, 29, 35. In other instances, Plaintiffs rely on seemingly irrelevant or contradictory testimony. For example, Plaintiffs cite testimony addressing a supervisor position restructuring that occurred in 2012 that did not affect any Plaintiffs' employment. See id. at 9. In another instance, Plaintiffs claim Defendant Carlson testified regarding "unspoken policies" that resulted in disparate work assignments. See id. at 15. But a review of Carlson's deposition transcript reveals that Carlson was unaware of any such policy, and that Carlson supported the uniform application of work policies. Walsh Aff. Ex. 32, Deposition of Lane Carlson ("Carlson Dep.") 95-98. As a final example, Plaintiffs argue the City had a "pattern" of failing to prevent discrimination toward disabled Plaintiffs, but they cite only to testimony regarding the treatment of Defendant Don Moody. See id. at 33. Plaintiffs offer no evidence of experiencing or observing disability-based discrimination themselves.

In theory, a sufficient number of individual observations or examples could be evidence

of a "continuing, widespread, and persistent" course of unconstitutional conduct by the City. But the handful of anecdotal examples offered by Plaintiffs that have at least some support in the record do not create a question of fact regarding "misconduct so pervasive among non-policymaking employees of the municipality as to constitute a custom or usage with the force of law." Monell, 436 U.S. at 691 (internal quotation omitted). Even if Plaintiffs had introduced sufficient evidence to indicate such a practice, Plaintiffs have not demonstrated how the City exercised deliberate indifference or tacit endorsement of such a custom, the second element required for § 1983 liability.

## 2. Individual Defendants Acting In Official Capacities

Plaintiffs have sued the Individual Defendants in their official capacities. See Am. Compl. ¶ 286. In an official capacity claim, the government official is an agent of the public entity, and the "real party in interest is the entity" itself. Clay v. Conlee, 815 F.2d 1164, 1170 (8th Cir. 1987) (citation omitted). And the governmental entity is only liable when the entity is a "moving force" behind the alleged violation. See id. (citing City of Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985)).[3]

As discussed above, Plaintiffs have not demonstrated a question of fact with regard to the existence of a policy or custom that violates the Fourteenth Amendment. Without establishing such a policy or custom, Plaintiffs have no basis for claiming against the individual defendants in their official capacities.

---

[3] A supervising official may be liable for a failure to train or supervise an offending actor. Parrish v. Ball, 594 F.3d 993, 1001-02 (8th Cir. 2010). But Plaintiffs' token arguments in this regard are unsupported by any evidence, or rely on irrelevant deposition testimony. See, e.g., Pls.' Opp'n at 29.

### 3. Individual Defendants Acting In Individual Capacities

Plaintiffs have also sued the Individual Defendants in their individual capacities. Generally, individual capacity suits "involve actions taken by governmental agents outside the scope of their official duties."  Nix v. Norman, 879 F.2d 429, 431 (8th Cir. 1989).  However, government agents are "shielded from § 1983 damage liability if their conduct did not violate clearly established constitutional rights of which a reasonable official would have known." Murphy v. State of Ark., 127 F.3d 750, 755 (8th Cir. 1997) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Discriminating among individuals or groups based on their race or other protected-class status violates clearly-established rights.  See, e.g., id. (citation omitted).  The Court evaluates Plaintiffs' individual claims in Section III.G., below.  As that section demonstrates, Plaintiffs have failed to establish genuine questions of fact with regard to their claimed violations of law.  Without such violations, the Individual Defendants must receive qualified immunity.

## D.  Plaintiffs' § 1981 Claim (Count 2)

### 1.  The City

The Eighth Circuit Court of Appeals has held that a "federal action to enforce rights under § 1981 against a state actor may only be brought pursuant to § 1983."  Artis v. Francis Howell N. Band Booster Ass'n, Inc., 161 F.3d 1178, 1181 (8th Cir. 1998) (citation omitted).  In some cases, Eighth Circuit courts have construed pleadings liberally to allow a § 1981 claim for discrimination against a municipality to be properly brought under § 1983.  See, e.g., Lockridge v. Bd. of Trustees, 315 F.3d 1005, 1007 (8th Cir. 2003).  In this case, however, such a construction is unnecessary and inappropriate.  Plaintiffs brought separate claims under §§ 1981

and 1983, and specifically named the Fourteenth Amendment as the basis for their § 1983 claim. Am. Compl. ¶ 291. As a result, the Court addresses Count 2 of the Amended Complaint separately, and dismisses the § 1981 count with respect to the City.

### 2. Individual Defendants

As demonstrated in Section III.G., below, Plaintiffs have not established material questions of fact with regard to their claims of discrimination. As a result, the Court finds qualified immunity shields the Individual Defendants from § 1981 liability.

## E. Plaintiffs' Aiding And Abetting Claims (Counts 6, 8)

In Count 6 of the Amended Complaint, Plaintiffs allege aiding and abetting illegal discrimination in violation of the MHRA and MCRO. Am. Compl. ¶¶ 327-30. In Count 8, Plaintiffs again allege aiding and abetting, but this time in violation of the MCRO alone. Id. ¶¶ 335-36. As it is unclear how Count 8's MCRO claim differs from Count 6's claim, the claims will be addressed together.

The MHRA prohibits any person from intentionally aiding, abetting, inciting, coercing, or compelling another person to engage in the discriminatory conduct prohibited by the MHRA. Minn. Stat. § 363A.14 (2012). A defendant is liable for an aiding and abetting violation under the MHRA if: (1) another person's conduct violates the MHRA; and (2) the defendant knows that this person's conduct violates the MHRA and the defendant "gives substantial assistance or encouragement to the other [person] so to conduct himself." Matthews v. Eichorn Motors, Inc., 800 N.W.2d 823, 830 (Minn. Ct. App. 2011) (quoting Restatement (Second) of Torts § 876(b) (1979)). Generally speaking, knowledge of a violation combined with inaction does not constitute "substantial assistance." See id. at 831 (citing Failla v. City of Passaic, 146 F.3d 149,

158 (3d Cir. 1998)).  Individual employees are not liable under the MHRA for discrimination, though they may be liable for aiding and abetting a violation of the MHRA.[4]  Iyorbo, 2003 WL 22999547, at *3.  The MHRA standard for "aiding and abetting" applies to Plaintiffs' MCRO claims as well.  See, e.g., St. Hilaire v. Minco Prods., Inc., 288 F. Supp. 2d 999, 1004, n.7 (D. Minn. 2003) (citation omitted).

Plaintiffs' aiding and abetting claims are unsupported by evidence.  As discussed below, Plaintiffs have failed to establish a genuine question of material fact with respect to any alleged MHRA violation.  Without an underlying violation of the MHRA, no claim for aiding and abetting can survive.  Plaintiffs explicitly discuss their aiding and abetting claim only with respect to Defendants Carrie Van DeVoort and Don Moody.  Van DeVoort and Moody had a romantic relationship in the 1990s, and Plaintiffs argue this relationship led them to "collude, aid and abet each other" in discrimination and retaliation.  Pls.' Opp'n at 34.  But beyond Moody's cursory testimony regarding his relationship with Van DeVoort, Plaintiffs offer absolutely no evidence regarding such collusion.  Similarly, Plaintiffs make allegations regarding a discriminatory plot to terminate Plaintiff Tarbert, but do not offer a single piece of evidence in support of their claim.  See Pls.' Opp'n at 37.  Given this utter lack of support, the Court finds no questions of material fact and grants summary judgment on Counts 6 and 8.

**F.  Applicable Legal Standards For Plaintiffs' Remaining Claims**

Plaintiffs' remaining claims, analyzed individually in Section III.G., are subject to the

---

[4]  Public officials may assert official immunity in defense against an MHRA claim.  But violations of the MHRA typically involve the sort of malicious or willful conduct that pierces the official immunity shield.  See State v. City of Mounds View, 518 N.W.2d 567, 571 (Minn. 1994).

following legal standards.

**1. Exhaustion Of Administrative Remedies And Statutes Of Limitation**

A plaintiff must exhaust his or her administrative remedies before filing claims under Title VII, the ADEA, the ADA, and the MCRO. See Woelbling v. R.C. Wilson Co., 966 F. Supp. 858, 861 (E.D. Mo. 1997) (addressing exhaustion requirement for Title VII, ADEA, and ADA claims); M.C.O. § 141.60(a). Generally, a plaintiff may not sue in civil court under Title VII until: (1) 180 days pass since the plaintiff first filed his or her charge of discrimination with the EEOC; and (2) the plaintiff receives a "right to sue" letter from the EEOC. See Jones v. Am. State Bank, 857 F.2d 494, 499-500 (8th Cir. 1988). If a plaintiff files suit without a "right to sue" letter in hand, the plaintiff may cure this defect if he or she receives the "right to sue" letter before dismissal of the suit. See id. Conversely, if the plaintiff receives a right to sue letter before initiating a private action, he or she then has 90 days within which to file the complaint. 42 U.S.C. § 2000e-16(c).

In addition, if a plaintiff files a civil complaint with claims of discrimination "outside the ambit" of his or her predicate EEOC charge, the plaintiff has failed to exhaust administrative remedies with regard to those claims. Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 223 (8th Cir. 1994) (citation omitted). Thus, Title VII, the ADA, the ADEA, and the MCRO bar civil discrimination claims outside the scope of a plaintiff's EEOC charge.

The MHRA does not require the exhaustion of administrative remedies. However, if a plaintiff does file an MHRA claim with an administrative body, he or she has 45 days to file civil suit upon receiving the "right to sue" notice. Minn. Stat. § 363A.33. The MHRA presumes the letter is received within 5 days from the date of the administrative decision. Id. § 363A.33, subd.

3.  If the plaintiff does not file a charge with an administrative body, he or she has one year from the MHRA violation within which to file suit.  Id. § 363A.28.

The MDAA does not require an exhaustion of administrative remedies, and allows plaintiffs to file suit up to two years after the discriminatory act.  See Lecy v. Sage Co, 460 N.W.2d 102, 104 (Minn. Ct. App. 1990).

Finally, plaintiffs do not need to exhaust administrative remedies before filing under §§ 1981 or 1983.  Section 1981 has a four-year statute of limitations, and the statute of limitations for § 1983 is the subject of inconsistent rulings.  See Hester v. Redwood Cnty., --- F. Supp. 2d ----, 2012 WL 3230178, at *7 (D. Minn. 2012) (collecting cases finding two- and six-year statutes of limitation).  Because Plaintiffs' claims do not succeed on the merits, the Court does not address § 1983's statute of limitations.

### 2.  Disparate Treatment And Retaliation (Counts 1, 2, 3, 4, 5, 7)

Plaintiffs allege disparate treatment based on their protected class statuses, as well as retaliation, in violation of Title VII, § 1981, § 1983, the ADEA, the ADA, the MDAA, the MHRA, and the MCRO.

 For a claim of disparate treatment to survive summary judgment, a plaintiff must offer either direct or indirect evidence of discrimination.  Elnashar v. Speedway SuperAmerica, LLC, 484 F.3d 1046, 1055 (8th Cir. 2007).  If the plaintiff offers direct evidence of discrimination, the test outlined by the Civil Rights Act of 1991 applies.  See id.  If the Plaintiff offers evidence which requires the use of inferences to determine discrimination, that is indirect evidence of discrimination and the McDonnell Douglas burden-shifting framework applies.  See id.

Here, the parties agree that the McDonnell Douglas framework applies.  Although

Plaintiffs occasionally refer to "direct evidence" of discrimination in their memorandum, they analyze their claims only in the context of pretextual discrimination. See, e.g., Pls.' Opp'n at 41. Also, counsel for both parties at oral argument discussed Plaintiffs' claims solely in terms of pretextual discrimination. As such, the Court will apply the McDonnell Douglas framework to Plaintiffs' claims of disparate treatment and retaliation. See Humphries v. Pulaski Cnty. Special Sch. Dist., 580 F.3d 688, 692 n.3 (8th Cir. 2009) (applying McDonnell Douglas framework to Title VII and § 1981 and § 1983 claims); Rothmeier v. Inv. Advisers, Inc., 85 F.3d 1328, 1331-32 (8th Cir. 1996) (applying frame work to ADEA claim); Golden v. Cretex Cos., Inc., 337 F. Supp. 2d 1164, 1168 (D. Minn. 2004) (applying framework to MHRA and MDAA claims); Minneapolis Police Dep't v. Minneapolis Comm'n on Civil Rights, 425 N.W.2d 235, 238 (Minn. 1988) (applying framework to MCRO claim); Christopher v. Adam's Mark Hotels, 137 F.3d 1069, 1071-72 (8th Cir. 1998) (applying framework to ADA claim).

Three "stages" comprise the McDonnell Douglas burden-shifting framework. See generally, McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see also Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981) (elaborating on burden-shifting elements of McDonnell Douglas test). First, the plaintiff must establish a prima facie case of discrimination. See Guimaraes v. SuperValu, Inc., 674 F.3d 962, 973 (8th Cir. 2012). Second, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its decision. Id. To do so, the defendant need only introduce evidence sufficient to raise a genuine issue of fact regarding the articulated reason. See Burdine, 450 U.S. at 254-56. Third, if the defendant is able to articulate such a reason, the burden shifts back to the plaintiff to show that the stated reason was a pretext. Id.

At oral argument, Defendants conceded that Plaintiffs had established prima facie cases of discrimination, though they did not make this concession regarding Plaintiffs' claims of retaliation. The Court thus relies on the parties' agreement that Plaintiffs have satisfied the first element of the framework with regard to Plaintiffs' claims of discrimination, and addresses only the second and third elements in its analysis.

With regard to retaliation, courts still apply the McDonnell Douglas framework, though they modify the elements needed to prove a prima facie case. See Adams v. West Pub. Co., 812 F. Supp. 925, 933 (D. Minn. 1993) (citations omitted). To establish a prima facie case of retaliation, a plaintiff must show that: (1) the plaintiff engaged in conduct protected by the applicable statute; (2) the plaintiff was subjected to adverse employment action at the time of, or after, the protected conduct occurred; and (3) a causal link exists between the protected activity and the adverse employment action. See id.

A plaintiff's prima facie evidence may be sufficiently strong to establish the requisite showing of pretextual discrimination and satisfy the third element of McDonnell Douglas. See Rothmeier, 85 F.3d at 1335 (citation omitted). But whether that is true depends on the facts of the case, and the failure to raise any evidence of pretext may warrant summary judgment against the plaintiff. See id. Absent strong prima facie evidence, a court may look to sources such as the comparative treatment of similarly-situated individuals. See Cherry v. Ritenour Sch. Dist., 361 F.3d 474, 479 (8th Cir. 2004) ("[P]robably the most commonly employed method of demonstrating that an employer's explanation is pretextual is to show that similarly situated persons of a different race or sex received more favorable treatment.") (citations omitted). The "similarly situated" test is a rigorous one. Id. (citation omitted).

### 3. Hostile Environment (Counts 3, 4, 5, 7)

Plaintiffs allege hostile environment violations of Title VII, the ADA, the ADEA, the MHRA, the MDAA, and the MCRO based on membership in various protected classes. To sustain a claim for hostile work environment, a plaintiff must show: "(1) he or she is a member of a protected class; (2) he or she is subjected to unwelcome [class]-based harassment; (3) the harassment was because of membership in the protected class; and (4) the harassment affected a term, condition, or privilege of his or her employment." Anderson v. Durham D & M, LLC, 606 F.3d 513, 518 (8th Cir. 2010) (citation omitted). The Eighth Circuit has set a relatively high bar for such claims, as the workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive." Id. (citation omitted). Finally, "the environment must be both objectively hostile as perceived by a reasonable person and subjectively abusive as actually viewed" by the plaintiff. Id. at 518-19 (citation omitted). The objective element is considered under a "totality of the circumstances" framework. Id.

### 4. Plaintiffs' Disparate Impact Claims (Counts 4, 5, 7)

Plaintiffs allege disparate impact discrimination violations of Title VII, the ADA, the ADEA, the MDAA, and the MCRO based on membership in various protected classes.

In their summary judgment memoranda, the parties have conflated disparate treatment discrimination with disparate impact discrimination. However, a claim for disparate impact discrimination invokes an entirely different analysis from disparate treatment discrimination. See Ratheyon Co. v. Hernandez, 540 U.S. 44, 52-53 (2003) (holding the Supreme Court has "consistently recognized a distinction between claims of discrimination based on disparate treatment and claims of discrimination based on disparate impact"). To establish a prima facie

case of disparate impact, a plaintiff must: (1) identify a specific, facially-neutral employment practice; and (2) "statistical evidence of a kind and degree sufficient to show that the practice in question caused the plaintiff adverse employment action because of his or her membership in a protected group." Evers v. Alliant Techsystems, Inc., 241 F.3d 948, 953-54 (8th Cir. 2001).

Here, a disparate impact analysis is unnecessary because Plaintiffs have not exhausted their administrative remedies with regard to these claims. Nowhere in any of the Plaintiffs' numerous administrative charges of discrimination have Plaintiffs alleged the disparate effect of a facially-neutral policy. All Plaintiffs have thus failed to exhaust their administrative remedies in this regard. See, e.g., Brown v. Ameriprise Fin. Servs., Inc., 707 F. Supp. 2d 971, 975-76 (D. Minn. 2010) (dismissing disparate impact claim for failure to exhaust administrative remedies).

Even assuming Plaintiffs had exhausted their administrative remedies, Plaintiffs have still failed to establish genuine questions of material fact with regard to their disparate impact claims. Plaintiffs do not identify a single facially-neutral policy that they argue has caused a disparate impact by virtue of its application. In addition, Plaintiffs have offered no statistical or other comprehensive evidence that might allow a prima facie determination of a policy's disparate effect. See, e.g., Bennett v. Nucor Corp., 656 F.3d 802, 817-18 (8th Cir. 2011). As a result, the Court dismisses Plaintiffs' disparate impact claims.

## G. Individual Plaintiffs' Remaining Claims

### 1. Ronald Benford

Plaintiff Benford is a 63 year old African-American male. Pls.' Opp'n at 9-10. Benford began working for the City at the MCC in October 1989. Am. Compl. ¶ 12. Benford held the title of Operations Maintenance Specialist ("OMS") during the span of his employment, a job

20

that includes janitorial and maintenance responsibilities.  See Benford Dep. 21-24.  In 2004 and

2006, Benford filed two charges of discrimination with the EEOC and Minneapolis Department

of Civil Rights (MDCR).  Sautter Aff. [Docket No. 61] Exs. Benford1A, Benford1C.  In those

charges, Benford alleged discrimination based on race, reprisal, and retaliation.  Id.  Benford's

claims included an incident in which Defendant Schoeben used the word "boy" as phonetic

identifier for "Hall B" at the MCC.  See id.  Benford also alleged receiving unfavorable jobs

from particular supervisors.  Id.  In December 2006, after he filed his second charge, Benford

entered into a Conciliation Agreement with the City.  Id. at Ex. Benford1D.  In exchange for a

lump sum payment, Benford agreed to release any and all discrimination claims against the City.

Id.  The parties also agreed not to engage in any retaliation.  Id.

      In 2007 and 2008, Benford filed three additional charges with the MDCR and the EEOC.

Id. at Exs. Benford2A–Benford4C.  In this set of charges, Benford alleged discrimination based

on race and age in addition to retaliation.  Benford alleged that the City employees at the MCC

were continually harassing him, which created a hostile work environment.  Id.  He also alleged

being disciplined for minor infractions as retaliation for entering into the Conciliation

Agreement.[5]  Id.

      Over the course of his employment, Benford received several disciplinary actions for

---

[5]  In the Amended Complaint, Plaintiffs argue Defendants have breached Benford's 2006
Conciliation Agreement, thus entitling them to revisit events that took place before its execution.
In addition, Plaintiffs argue for damages as a result of the alleged breaches.  Defendants respond
that Plaintiffs have no basis for asking for damages under the Conciliation Agreement, that the
agreement applies only to Benford, and that the agreement prevents Benford from re-asserting
claims he previously settled.  Defs.' Mem. Supp. Summ. J. [Docket No. 60] ("Defs.' Supp.") 21-
24.  Benford is the only Plaintiff who entered into the Conciliation Agreement, and thus it has no
bearing on any other Plaintiff's claims.  Plaintiffs make no response to these arguments, so this
broad and vague claim regarding breach of the 2006 Conciliation Agreement is abandoned.

being out of his work area and taking unauthorized breaks.[6]  See id. at Ex. Benford6.  In May

2008, Benford was disciplined for taking an unauthorized break by reading a newspaper outside

of his work area.  Id.  On June 9, 2008, the City terminated Benford after 19 years of

employment.  Id.

In November 2010, the MDCR dismissed one of Benford's charges as frivolous and

lacking merit.  Id. at Ex. Benford4B.  On November 24, 2010, the MDCR dismissed Benford's

remaining two charges upon receiving notice that Benford intended to pursue private action.  Id.

at Exs. Benford2C, Benford3B.

### a.  Exhaustion of remedies/unsupported claims

Benford has not filed an EEOC or MDCR charge for discrimination based on disability,

gender, color, religion, or national origin.[7]  As a result, he has failed to exhaust his administrative

remedies with regard to any such claims under Title VII, the ADA, the ADEA, and the MCRO.

See Williams, 21 F.3d at 223.  Because the City terminated him in June 2008 and Plaintiffs filed

suit in November 2010, Benford's claims also fall outside the MHRA and MDAA statutes of

limitation.  Regardless, Benford offers no evidence, or even argument, that Defendants

discriminated against him on these bases.

### b.  Disparate treatment

Benford did file claims of discrimination based on age and race, and the City conceded

---

[6]  Several of these disciplinary actions were "coaching" sessions, wherein a supervisor
addresses a particular behavior with an employee.  Plaintiffs contend coaching exists in a gray
area where it only sometimes qualifies as discipline and thus allows for the disparate application
of discipline.  See Pls.' Opp'n at 24.

[7]  Color discrimination, which can occur between people of the same race, is a discrete
form of discrimination separate from race discrimination.

22

that Benford established prima facie cases for each under the <u>McDonnell Douglas</u> framework. With regard to age discrimination, Benford testified that as a senior OMS employee, he expected to receive more favorable assignments but instead received the "worst" jobs. Benford Dep. 30-32. The City argues that Benford never received work assignments outside of his work description. Defs.' Supp. at 26. In response, Plaintiffs offer no evidence regarding the seniority system or its relationship to work assignments. Benford cites no evidence whatsoever that might otherwise show pretextual age discrimination, including a total lack of evidence regarding similarly-situated employees. <u>See, e.g.</u>, <u>Tolen v. Ashcroft</u>, 377 F.3d 879, 882-83 (8th Cir. 2004). And Benford concedes that he never received work assignments outside of his job description. <u>Id.</u> In light of these facts, Benford has not established a genuine question of fact with regard to age discrimination.

Responding to his claim of race discrimination, the City states Benford was terminated due to a "long history" of infractions related to unauthorized breaks. Defs.' Supp. at 25-26. In response, the only evidence Benford cites of pretextual race discrimination is an instance in which Defendant Zasada, a supervisor, also read a newspaper while on the job but was not disciplined. Walsh Aff. Ex. 29, Deposition of John Zasada ("Zasada Dep.") 183-84. In that instance, Zasada testified he picked up a newspaper to throw it away, and paused to read it for 8-10 minutes. <u>Id.</u> Benford offers no evidence that Zasada, his supervisor, was a similarly-situated employee with a comparable history of discipline for taking unauthorized breaks. <u>See</u> <u>Harvey v. Anheuser-Busch, Inc.</u>, 38 F.3d 968, 972 (8th Cir. 1994) (holding plaintiff had burden of proving disparately treated Caucasian employees were "similarly situated in all relevant respects") (citation omitted).

When weighed against Benford's several documented infractions over the course of several years for taking unauthorized breaks, this single, anecdotal example does not create a genuine issue of fact regarding pretextual discrimination.[8] Plaintiffs also refer back to an instance in 2004 when Defendant Schoeben used the word "boy," as descriptive of "Hall B" at the MCC. That incident is well outside the timeframe of Benford's relevant EEOC charges. Plaintiffs have presented no evidence that the Schoeben incident was part of a larger pattern, or that it evidenced a discriminatory attitude that resulted in Benford's lack of advancement or termination.

### c. Hostile work environment

Although Benford alleges experiencing a hostile work environment in his most recent administrative charge, he has not supported this claim with evidence at the summary judgment stage. Plaintiffs cite Benford's testimony in which he recounts complaining about "being harassed by upper management," but they offer no specific evidence of such harassment. See Pls.' Opp'n at 13-14. Even assuming evidence of Schoeben's use of the word "boy" is not barred by the statutes of limitation, Plaintiffs do not demonstrate how this single instance affected a "term, condition, or privilege" of Benford's employment. See Anderson, 606 F.3d at 518. Although the word "boy" has a well-known history as a racially-derogatory term as well as a benign meaning, Benford does not demonstrate how this single use of the term—even if its derogatory use is inferred—created a "sufficiently severe and pervasive" atmosphere of racial

---

[8] Plaintiffs cite the testimony of Defendant Carlson for their contention that no one received discipline similar to Benford's for taking unauthorized breaks. Pls.' Opp'n at 14-15. But in the cited deposition pages, Carlson testified regarding his recollection of disciplinary measures at another employer, not at the MCC. Carlson Dep. 37-38. Plaintiffs' misleading citations, whether intentional or inadvertent, are not appreciated.

harassment.  See id.  Benford cites no other examples of harassment.

### d. Retaliation

Benford argues that his disparate work assignments and ultimate termination resulted from retaliation in response to his initial administrative complaints.  Benford has not demonstrated a causal link between his legally-protected complaints of discrimination and his disparate work assignments or termination.  See Adams, 812 F. Supp. at 933.  As noted, Benford has not cited any evidence of receiving unfavorable work assignments as compared to others, or that he received work assignments outside of his normal job duties.  See Benford Dep. at 30-32.  Nor has Benford offered any evidence that might suggest the City terminated him in retaliation for his administrative charges, or for the Conciliation Agreement.  Also, a temporal connection between engaging in protected activity and an adverse employment action may at least support an inference of retaliation.  See Peterson v. Scott Cnty., 406 F.3d 515, 524-25 (8th Cir. 2005) (holding that in general, "more than a temporal connection is required to present a genuine factual issue on retaliation"), abrogated in part on other grounds, Torgeson, 643 F.3d at 1043.  But Benford's termination was four years after his first charge of discrimination, making such an inference weak at best.  Without at least some evidence of retaliatory motive, the Court cannot conclude that Benford has established a question of fact on his retaliation claim.

### 2. John A. Tarbert

Plaintiff John Tarbert is an African-American male who began employment at the MCC on September 13, 1993.  Am. Compl. ¶ 13.  Tarbert's last position at the MCC was as an OMS in the Production Services-Set Up department.  Id.

Tarbert filed a total of three administrative charges.  On January 30, 2007, Tarbert filed

his first administrative charge with the EEOC and the MDCR for discrimination based on race and religion. Sautter Aff. Ex. Tarbert1A. Tarbert also alleged experiencing a hostile work environment for the same reasons. Id. On January 10, 2010, the MDCR dismissed Tarbert's charge, finding Tarbert had not demonstrated discrimination or a hostile work environment. Id. at Ex. Tarbert1B. The EEOC adopted the MDCR's findings and issued a "right to sue" letter on March 9, 2011. Id. at Ex. Tarbert1C.

On August 14, 2007, Tarbert filed a second charge with the EEOC and MDCR, alleging retaliation. Id. at Ex. Tarbert2A. On January 12, 2010, the MDCR dismissed Tarbert's charge, concluding Tarbert had not demonstrated a prima facie case of retaliation. Id. at Ex. Tarbert2B. The EEOC also adopted these findings and issued a "right to sue" letter on March 9, 2011.

On December 7, 2010, almost one month after filing the original Complaint in this action, Tarbert filed a new charge based on age discrimination, which included many of the same allegations from his second charge. Id. at Ex. Tarbert3A. On February 7, 2011, the MDCR dismissed Tarbert's final charge as frivolous. Id. at Ex. Tarbert3B. The EEOC adopted this finding on April 28, 2011. Id. at Tarbert3C.

The City terminated Tarbert on September 7, 2010, prompted by damage caused to MCC bleachers. The City believes Tarbert, using a forklift, caused damage in excess of $15,000. Tarbert denies responsibility for the damage. See id. at Ex. Tarbert4; Pls.' Opp'n at 36-39.

### a. Exhaustion of remedies/unsupported claims

As a preliminary matter, any potential claims for disability, national origin, gender, or color discrimination are precluded under Title VII, the ADA, the ADEA, and the MCRO for a failure to exhaust administrative remedies. Tarbert also fails to make any argument, or cite any

evidence, that Defendants have discriminated against him in these regards. As a result, the Court dismisses these claims.

### b. Disparate treatment

Tarbert claims the City discriminated against him on the bases of his age, race, and religion. Although Tarbert filed suit prematurely with regard to his age discrimination claim, he later received his "right to sue" letter and thus cured this defect. His claim could also be deemed timely under the MDAA. However, Tarbert does not make any argument or offer any evidence demonstrating how he was discriminated against by his age, and so the Court dismisses this claim.

The City has conceded that Plaintiffs established prima facie cases of race and religion discrimination under the McDonnell Douglas framework. The City contends that it terminated Tarbert not for any discriminatory reason, but because of the property damage to the bleachers it believes Tarbert caused and because of Tarbert's history of substandard performance. Defs.' Supp. at 29. The parties argue at length about whether Tarbert actually damaged the bleachers. Plaintiffs attempted to submit two DVDs to the Court containing expert testimony that Judge Brisbois specifically excluded in his July 30, 2012, Order. See Pls.' Opp'n at 38.

Setting aside this clear disregard for a court order, the City's stated reason for termination is reasonable in light of the evidence. The City had a sufficient basis to conclude Tarbert damaged the bleachers, and the Court will not second-guess this business decision. See Moschetti v. Chicago, Cent. & Pac. R.R. Co., 119 F.3d 707, 710 (8th Cir. 1997). The City also cites Tarbert's extensive history of disciplinary actions and suspensions, which include 16 formal disciplinary actions dating back to 1997, as well as two negative job performance

reviews.  <u>See</u> Sautter Aff. Ex. Tarbert4.  In response, Tarbert offers nothing beyond supposition.

Plaintiffs allege Defendants terminated Tarbert as the result of a long, concerted, and pretextual

effort, but in support they offer only literally-blank citations to the record.  <u>See</u> Pls.' Opp'n at 37.

Given his total lack of evidence, Tarbert  has not established material questions of fact

concerning his race and religion discrimination claims.

### c.  Hostile work environment

Tarbert alleges a hostile work environment based on race and religion in the Amended

Complaint and in his administrative charges.  Although Plaintiffs have failed to proffer specific

evidence or arguments that Defendants harassed Tarbert, the Court views the evidence in the

light most favorable to Plaintiffs and identifies two possible instances of harassment.  First,

Tarbert describes an instance in which Defendant Hicok told him, "I don't see you working here

much longer."  Pls.' Opp'n at 37.  In a separate instance, Tarbert also argues Defendants Hicok

and Perry brought Tarbert to tears, though Tarbert does not explain how.  <u>Id.</u>  Plaintiffs do not

provide a single citation to the record in support of either allegation.  Even if Plaintiffs had

offered facts to support these claims, these two instances do not satisfy the requirements for a

hostile work environment claim.  <u>See</u> <u>Anderson</u>, 606 F.3d at 518.

### d.  Retaliation

Tarbert appears to claim that the City terminated him in retaliation for speaking out about

discrimination.  Pls.' Opp'n at 39.  But as noted, Tarbert has not introduced a single fact that

might evidence a discriminatory or retaliatory motive.  As a result, Tarbert has done nothing to

establish a causal link between his filing of administrative charges and his termination.  And as

the Defendants argue, Tarbert's incidents of disciplinary action did not increase in any

significant way after Tarbert filed his 2007 administrative charge.  <u>See</u> Sautter Aff. at Ex. Tarbert4.  Because Tarbert offers no facts to support his claim, Tarbert has not established a prima facie case of retaliation.

### 3. Betty Martin

Defendant Betty Martin is a Native American woman.  Am. Compl. ¶ 14.  Martin began working at the MCC on February 10, 1991.  Her last employment position was as an OMS in the Production Services-Set Up department.  <u>Id.</u> ¶ 14.  The City terminated Martin on March 24, 2006, for taking an unauthorized break.  Sautter Aff. Ex. Martin2.

On November 29, 2006, Martin filed a charge of discrimination with the EEOC and MDCR, alleging race and sex discrimination as well as retaliation and a hostile work environment.  Sautter Aff. at Ex. Martin1A.  In the charge, Martin alleged Defendants Zasada and Perry made derogatory and belittling remarks toward her, and that her supervisors retaliated against her after she filed a complaint with the City's Human Resources Department.  <u>Id.</u>  On June 16, 2008, the MDCR issued a finding of "No Probable Cause" with regard to Martin's claims.  <u>Id.</u> at Ex. Martin1B.  Martin appealed, and on February 25, 2009, an MDCR review panel upheld the dismissal.  Martin apparently received her "right to sue" letter from the EEOC on August 10, 2010, 94 days before Plaintiffs filed the original Complaint.[9]  Am. Compl. ¶ 209.

### a. Exhaustion of remedies/unsupported claims

Because Martin did not file administrative charges of discrimination on the basis of national origin, color, disability, or religion, she is precluded from raising these claims under

---

[9]  Neither Plaintiffs nor Defendants appear to have placed a copy of Martin's "right to sue" letter in the record.  Because the parties agree regarding the timing of this notice, the Court adopts the date of issuance.  <u>See</u> Defs.' Supp. at 10.

Title VII, the ADA, the ADEA, and the MCRO.  Even if Martin had raised these claims, she now presents no evidence supporting them.  As a result, the Court dismisses these claims.

Defendants argue Martin should also be precluded from raising her remaining claims, as Plaintiffs initiated this action four days after Martin's 90-day deadline to file under Title VII expired.  Defs.' Supp. at 10.  But Eighth Circuit courts have allowed plaintiffs an additional three to five days to receive "right to sue" letters by mail, unless proof of mailing demonstrates otherwise.  See, e.g., Luckett v. Herbster Hellweg Painting, No. 4:08CV00187, 2008 WL 2620894, at *1 (E.D. Mo. Apr. 29, 2008).  Because Martin's remaining claims do not survive summary judgment on the merits, it is not necessary to decide whether the Title VII statute of limitations precludes them.

### b.  Disparate treatment

Martin alleges being disciplined unfairly and ultimately being terminated as a result of race and sex discrimination.  As noted, the City conceded that Martin demonstrated a prima facie case of discrimination.  In satisfaction of the second element of the McDonnell Douglas framework, the City states Martin had numerous documented instances of discipline, and that it terminated her for taking an unauthorized break.  Defs.' Supp. at 32-33.  In response, Plaintiffs cite Martin's testimony, in which she recounts hearing racist jokes told by her supervisors in approximately 1992.  Martin Dep. 48-56.  Martin also testified about an incident in 1992 in which she witnessed a supervisor instruct Plaintiff McKelvy to pull a heavy cart without motorized assistance, despite white employees being allowed to use such assistance.  Id. at 42-45.

From about 1996 onward, Martin testified only that she was subjected to discrimination

and a hostile work environment, but did not recount a single instance of such treatment.[10]  Id. at

58-64.  Plaintiffs make reference to an internal "Investigation Summary" that concluded female

employees received harsher treatment than male employees by certain supervisors.  See, e.g.,

Pls.' Opp'n at 22.  However, Plaintiffs filed this report 20 minutes before oral argument on the

present motion, as an exhibit to an untimely—and legally and technically improper—motion to

supplement the record.  [Docket No. 85].  Because of Plaintiffs' numerous and egregious

discovery and filing abuses, the Court declines to consider this tardy material.  The remainder of

Plaintiffs' arguments regarding Martin focus on the discrimination Defendant Zasada believes he

experienced, and thus do not offer any further support for her claims.  Pls.' Opp'n at 23.

Given the lack of evidence within the appropriate timeframe, Martin has failed to

establish questions of fact regarding her claims of race and sex discrimination.  Martin's only

specific testimony regarding discrimination dates back to 1992, extends to only as late as 1996,

and deals with supervisors who have long since left the City's employ.  As Defendants correctly

argue, these incidents are outside all applicable statutes of limitation, as outlined in above in

Section III.F.1.  And Plaintiffs have not introduced evidence demonstrating a pattern of gender

or race discrimination that might circumvent this time limitation.  Even if the Court could

properly consider events that occurred over 15 years ago, these facts do not indicate that

discrimination motivated Martin's disciplining or termination.

---

[10]  Plaintiffs note in their memorandum that Martin attended two depositions.  Pls.' Opp'n
at 5.  Despite submitting thousands of pages deposition testimony, Plaintiffs appear to have
failed to submit the transcript of Martin's second deposition, and Martin's first deposition ended
abruptly.  See Martin Dep. at 63.

### c. Hostile work environment

Martin has not demonstrated a question of material fact with regard to her hostile work environment claim. Nowhere in her deposition testimony or Plaintiffs' memorandum does Martin identify a single instance of harassment that she experienced. Even assuming that overhearing racist jokes may constitute harassment, these jokes did not address any of Martin's protected class statuses, nor did they affect the terms, conditions, or privileges of her employment.

### d. Retaliation

In her administrative charge, Martin argues the City retaliated against her for filing a 2005 complaint with the City's Human Resources department. Plaintiffs do not address this contention in their memorandum, let alone offer evidence in its support. Martin has not demonstrated a material issue of fact with regard to her retaliation claim.

### 4. Irving Lackey

Plaintiff Irving Lackey is an African-American male who began working at the MCC on March 7, 2002, as an OMS in the Facilities Department. Am. Compl. ¶ 15. On December 23, 2003, Lackey filed a charge of discrimination with the EEOC and the MDCR, alleging race and sex discrimination. Sautter Aff. Ex. Lackey1-A. Lackey's 2003 charge focused exclusively on his claim of unfair treatment relative to a white, female coworker. See id. Lackey alleged that his supervisor at the time, Defendant Tesfa, favored Lackey's coworker by asking Lackey to do a disproportionately larger amount of work. See id. The MDCR determined that Lackey had not stated probable cause for his discrimination complaints, and notified him of the dismissal on July 11, 2005. Id. at Ex. Lackey1-B. The EEOC adopted the MDCR's conclusion and issued Lackey

a "right to sue" letter on September 1, 2005.

The City terminated Lackey on April 19, 2007.  Am. Compl. ¶ 15.  On April 20, 2007, Lackey filed a second charge with the EEOC and MDCR, alleging race, national origin, and religious discrimination.  Sautter Aff. Ex. Lackey4-A.  He also alleged retaliation and hostile work environment.  Id.  Lackey claimed primarily that Defendant Tesfa disciplined Lackey unfairly as compared to white employees, and Tesfa favored employees who belonged to Tesfa's church.  See id.  The MDCR dismissed Lackey's claims on December 23, 2010, finding no probable cause.  Id. at Ex. Lackey 4-B.  The EEOC adopted this finding and issued Lackey a "right to sue" letter on March 9, 2011.  Id. at Ex. Lackey 4-C.

### a.  Exhaustion of remedies/unsupported claims

Regarding Lackey's 2003 charge of discrimination, Lackey failed to timely file a civil action within 90 days of receiving his "right to sue" letter in September 2005.  As a result, Lackey's claims relating to disparate work assignments relative to a coworker fall outside the Title VII statute of limitations.  In addition, the alleged events in the 2003 charge occurred outside all applicable statutes of limitation in this action.

The Court finds that Lackey's 2007 charge allegations are timely filed in this action.  As noted in section III.F.1., above, under Title VII, a plaintiff must wait 180 days after filing his charge of discrimination before initiating a private action.  If he initiates an action without receiving a "right to sue" letter, he may later cure this defect by receiving the letter before the case is dismissed.  Lackey's procedural posture in this action falls into this "cured" category, and thus he satisfies the exhaustion of remedies requirement.  Nevertheless, in his 2007 charge of discrimination, Lackey did not claim color, sex, age, or disability discrimination.  He is thus

precluded from asserting those types of discrimination claims due to his failure to exhaust administrative remedies.  In any event, Lackey did not provide any evidence of discrimination that might support these claims.

### b. Disparate treatment

Lackey alleged claims for race, national origin, and religious discrimination.  Id. at Ex. Lackey4-A.  Because Defendants conceded Plaintiffs' prima facie cases of discrimination, the Court addresses the remaining elements of the McDonnell Douglas framework.  As reason for his termination, the City states Lackey left his work area to take an unauthorized break, despite being instructed not to do so just 45 minutes prior.  Id. at Ex. Lackey2.  The City argues that in addition to this violation of City policy, Lackey had several suspensions and disciplinary actions for similar or more egregious conduct.  See id.  To demonstrate pretext, Plaintiffs cite Lackey's deposition testimony.  Lackey testified that Tesfa supervised Lackey more closely than other employees, and that other employees did not receive disciplinary action for conduct similar to Lackey's.  Walsh Aff. Ex. 4, Deposition of Irving Lackey ("Lackey Dep.") at 55-57.  Lackey asserts Tesfa discriminated against him because Lackey was African-American while Tesfa was African-born.  See Lackey Dep. at 57.

Viewing the relevant evidence, Lackey's perceived national origin discrimination does not create a genuine question of fact.  While disparate treatment as compared with similarly-situated employees may demonstrate pretext, perceived disparity alone does not suffice.  See Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691-92 (8th Cir. 2002) (affirming summary judgment on disparate treatment claim after finding plaintiff failed to introduce evidence of employees with similar disciplinary histories).  Plaintiffs have not introduced evidence sufficient to allow a

comparison of Lackey to the employees he asserts are similarly-situated. For example, Lackey has not provided any evidence of any kind of the other employees' disciplinary actions, let alone the employees' actual disciplinary records. See id. Because Lackey provides no other evidence of pretext discrimination, the Court dismisses Lackey's claims for national origin, race, and religion discrimination.

### c. Hostile work environment

Because Lackey has not introduced evidence of a single instance of harassment, he has not demonstrated a material question of fact exists in this regard.

### d. Retaliation

Lackey has not established a prima facie case of retaliation. After Lackey filed his 2003 charge, he received disciplinary actions at even intervals for almost four years before the City terminated him. Although this may satisfy the first two requirements for a prima facie case of retaliation, it does not lend itself easily to an inference satisfying the third element: that Lackey's complaint caused his termination. An inference alone will not typically satisfy this third element, and the weak inference available in this instance is not enough to create a genuine issue of fact. See Peterson, 406 F.3d at 524-25.

### 5. Candis McKelvy

Plaintiff Candis McKelvy is an African-American female who began working at the MCC on February 19, 1991. Am. Compl. ¶ 16. McKelvy's last position of employment with the City was as an OMS in the MCC's Event Operations department. Id.

McKelvy filed a total of three charges of discrimination, each in 2010. On March 25, 2010, McKelvy filed a charge of discrimination alleging race, sex, disability, and age

discrimination.  Sautter Aff. Ex. McKelvy1A.  In that charge, McKelvy alleged receiving

disproportionate disciplinary actions as compared to other employees.  Id.  On June 3, 2010,

McKelvy filed a second charge alleging retaliation.  McKelvy alleged that as the result of her

first charge, the City had placed her under closer scrutiny and subjected her to increased

discipline.  Id. at Ex. McKelvy2A.  The City terminated McKelvy on July 15, 2010.  Am.

Compl. ¶ 16.  On July 22, 2010, McKelvy filed her third charge of discrimination, claiming race,

sex, and age discrimination, as well as retaliation.  Sautter Aff. Ex. McKelvy3A.  McKelvy

alleged being disciplined unfairly and not being given guidance regarding her performance

measurements.  Id. at Ex. McKelvy3A.  She also alleged the City terminated her to avoid paying

her retirement benefits.  Id.

The MDCR dismissed all three of McKelvy's charges after it learned—without proper

notification from McKelvy or her attorney—that McKelvy had filed the original complaint in

this action.  Id. at Exs. McKelvy1B, McKelvy2B, McKelvy3B.

### a. Exhaustion of remedies/unsupported claims

As discussed in Section III.F.1., above, Eighth Circuit decisions hold that filing a Title

VII claim without waiting the required 180-day period or receiving a "right to sue" letter

constitutes a failure to exhaust administrative remedies.  Jones, 857 F.2d at 499-500.

Nevertheless, the Eighth Circuit Court of Appeals has also indicated a preference for allowing

private suits to proceed despite technical exhaustion deficiencies.  See, e.g., id.  As a result, the

Court declines to preclude the claims in McKelvy's June 2010 and July 2010 charges as

prematurely filed.  Similarly, McKelvy's claims are subject to the statute of limitations in Title

VII, which prevent her from raising instances of discrimination that occurred 180 days before the

filing of her charge.  Because McKelvy has not established genuine issues of material fact, however, it is not necessary to reach McKevly's potential timeliness concerns.

In terms of the scope of her claims, McKelvy's claims for color, religion, and national origin discrimination fail for a failure to exhaust remedies under Title VII, the ADEA, and the MCRO.  As is the pattern in this case, McKelvy's claims also fail for want of any evidence.

### b.  Disparate treatment

McKelvy alleges race, sex, disability and age discrimination, and the Defendants concede McKelvy has established prima facie cases for each.  Satisfying the second element of the McDonnell Douglas framework, the City states it terminated McKelvy due an incident in which McKelvy expressed frustration in front of an MCC conference attendee.  Id. at Ex. McKelvy4. The City also notes several instances of disciplinary actions dating back to 2004 against McKelvy for discourteous or combative behavior.  Id.

In response, McKelvy relies exclusively on the testimony of Defendant Yang to argue that the incident the City alleges caused it to terminate McKelvy was taken out of context.  The only evidence cited in the record confirms that McKelvy expressed frustration when earlier staff members had failed to clean dishes.  Yang Dep. 229-32.  This evidence also confirms, however, that McKelvy expressed this frustration in front of an MCC patron.  The Court will not second guess the City's decision to terminate McKelvy, particularly given her history of disciplinary action for similar conduct.

In addition, Plaintiffs cite to two other examples of discriminatory treatment.  First, Plaintiffs assert a City employee called McKelvy a "black bitch."  Pls.' Opp'n at 29.  But Plaintiffs again rely exclusively on the testimony of Yang, who denies having any knowledge

about the incident.  Yang Dep. 237.  Without guidance from Plaintiffs, the Court located a portion of McKelvy's relevant testimony about the incident.  <u>See</u> McKelvy Dep. at 43-44. McKelvy testified that the use of this slur occurred in or around 1996 or 1998, well outside the applicable statutes of limitation.  <u>See id.</u>  Second, Plaintiff Martin testified regarding an incident that occurred in approximately 1996, in which a supervisor instructed McKelvy to move a heavy cart without motorized assistance.  Martin Dep. at 42-45.  As discussed, Plaintiffs have done nothing to establish continuing violations or patterns of discrimination that might allow the Court to consider such distant incidents.  Even if the Court did rely on this evidence, it does not suggest that the City terminated McKelvy over a decade later as a pretext for discrimination. McKelvy cites no other evidence regarding race or sex discrimination.  These claims are dismissed.

Regarding disability discrimination, McKelvy did allege in her March 2010 charge that her supervisors declined her request to use a motorized scooter.  But at summary judgment, McKelvy does not explain, let alone support with evidence, how this denial amounted to discrimination.  This claim is dismissed.

McKelvy also alleges the City terminated her just before her retirement to avoid paying her retirement benefits.  Setting aside the potential inapplicability of discrimination laws to a claim for deprivation of retirement benefits, McKelvy has failed to offer any evidence whatsoever suggesting an age discrimination motivation by the City or any of its actors. McKelvy's age at the time of her termination, by itself, does not raise a material question of fact.

### c.  Hostile work environment

The only potential evidence of harassment McKelvy presents relates to an incident dating

over 10 years ago.  This does not rise to the level necessary to create a genuine issue of material fact for a hostile work environment claim.

### d.  Retaliation

McKelvy has not produced any evidence that the City or its employees retaliated against her for engaging in protected activities such as complaining about unequal work assignments. On the contrary, Plaintiffs cite a portion of Yang's testimony in which Yang recounts being instructed by his supervisor, Defendant Langford, to "follow protocol" in addressing McKelvy's conduct.  Yang Dep. at 245-46.  McKelvy received several disciplinary actions over the course of years before the City terminated her.  The temporal connection of McKelvy's protected activities to her disciplinary actions is weak at best.  See Sautter Aff. Ex. McKelvy4.  However, the City did terminate McKelvy just a month after she filed her June 2010 administrative charge. See Am. Compl. ¶ 16.  But as noted, without some evidence of retaliatory motive, a temporal connection alone will not raise a genuine question of material fact.  See Peterson, 406 F.3d at 524-25.

### 6.  Gregory Gordon

Plaintiff Gregory Gordon is an African-American male who began working at the MCC on February 2, 1999.  Am. Compl. ¶ 258.  He remains employed at the MCC as an OMS in the Facilities Department.  Id. ¶ 17.  On December 7, 2007, Gordon filed a charge of race discrimination with the MDCR and the EEOC.  Sautter Aff. Ex. Gordon1-A.  In the charge, Gordon alleges being disciplined unfairly as compared to another African-American employee after the two engaged in an argument in October 2006.  Id.  He also alleges that the City questioned but did not charge him for a theft, and disciplined him for asking Defendant Perry, a

supervisor, if Perry wanted a work order returned.  <u>Id.</u>  In the charge, Gordon relates that Perry

described Gordon as "loud and disruptive during an employee meeting."  <u>Id.</u>  Gordon claims

these incidents amount to harassment and discrimination.  <u>See id.</u>  On December 13, 2010, the

MDCR issued a finding of "no probable cause" and dismissed Gordon's charge.  <u>Id.</u> at Ex.

Gordon1-B.  The EEOC adopted the MDCR's finding and issued a "right to sue" letter on March

9, 2011.  <u>Id.</u> at Gordon1-C.

### a. Exhaustion of remedies/unsupported

Gordon received his "right to sue" letter before dismissal of this action, and so this defect

in Gordon's filing prerequisites is cured.  <u>Jones</u>, 857 F.2d at 499-500.  However, in his

administrative charge, Gordon did not allege any claims of color, sex, religion, age, national

origin, or disability discrimination.  As a result, Gordon is precluded from claiming these forms

of discrimination under Title VII, the ADA, the ADEA, and the MCRO for a failure to exhaust

administrative remedies.  In addition, Gordon did not allege retaliation or a hostile work

environment in his charge, so these claims are similarly precluded.  Regardless, Gordon has

presented no evidence supporting any of these claims, and so they are dismissed.

### b. Disparate treatment

Gordon argues that the City assigned unfavorable jobs to him and other African-

American employees and disciplined him unfairly.  Pls.' Opp'n at 25-26.  Having conceded a

prima facie case of discrimination, the City states that it disciplined Gordon for his conduct, and

not based on his race.  The parties, in one form or another, discuss three specific instances of

discipline.  First, in his charge, Gordon recounted a 2006 incident in which he engaged in an

argument with a coworker.  In Plaintiffs' summary judgment response, however, Gordon offers

no discussion or facts of the altercation.  <u>See, e.g.</u>, Pls.' Opp'n at 25-27.  Second, Gordon also

charged the City with discriminating against him by investigating him for a theft in 2007.  The

City states that Gordon was working during the theft, and was observed on a camera entering the

room where the theft occurred.  Defs.' Supp. at 43-44.  The City ultimately dismissed its

investigation, and took no adverse action against Gordon.  <u>Id.</u>  Gordon offers no evidence to

contradict the City's version of events.  Third, the City identifies disciplinary action it took

against Gordon for insubordination.  <u>Id.</u> at 44.  Again, Gordon offers no response.

Gordon also broadly argues the City, and specifically Defendant Moody,

disproportionately assigned unfavorable jobs to him and other African-American employees.

Pls.' Opp'n at 26.  But Gordon offers no evidence of this practice beyond testimony of his

perceptions, and this testimony regards conduct that occurred in 2000.  <u>See id.</u>  Without any

other evidence, the Court finds Gordon has not established questions of material fact with regard

to his claim for race discrimination.

### c.  Hostile work environment

Gordon makes no argument, nor offers any evidence, to support a claim for hostile work

environment.

### d.  Retaliation

In Plaintiffs' memorandum, Plaintiffs describe an incident in 2000 when Gordon

complained about disparate work assignments.  Pls.' Opp'n at 25-26.  After making this

complaint, Gordon testified that several supervisors began observing him closely while he

worked.  <u>See id.</u>  But close observation does not constitute an adverse employment action.  <u>See</u>

<u>Horn v. Univ. of Minn.</u>, 362 F.3d 1042, 1046-47 (8th Cir. 2004) ("Employment actions which do

not result in changes in pay, benefits, seniority, or responsibility are insufficient to sustain a claim.") (citation omitted).  Gordon offers no other argument or factual support for an instance of retaliation, and so this claim fails.

## H.  Plaintiffs' Motion For Rule 56(d) Discovery And Other Relief

As noted at the outset, Plaintiffs filed their Motion to Supplement in violation of the Local Rules.  The motion makes four requests: (1) to allow the parties to obtain further discovery; (2) to allow Plaintiffs to supplement the summary judgment record; (3) to strike Defendants' reply in support of summary judgment; and (4) to designate certain exhibits as not confidential.

The Court addresses these requests in turn.  First, The Court affirms Judge Brisbois' Order—for the second time—in holding that Plaintiffs are not entitled to further discovery, particularly in light of Mr. Walsh's conduct in this litigation.  Second, the Court denies Plaintiffs' request to supplement the summary judgment record for the reasons stated at the hearing and in this Order.  Third, Defendants timely produced documents, save for a batch of compact discs that they produced one day past their discovery response deadline.  This delay hardly justifies striking Defendants' reply brief, and Plaintiffs offer no other cognizable basis for such relief.  Fourth, it is not clear from Mr. Walsh's affidavit which documents Mr. Walsh requests the Court designate as non-confidential.  Because Mr. Walsh appears to have publicly-filed at least some of these documents as an exhibit to his motion, and because the Court grants summary judgment, this request is denied as moot.

## IV.  CONCLUSION

Plaintiffs will understandably be disheartened by the dismissal of this case after litigating

for over two years.  Plaintiffs have spent considerable time and resources appearing for and taking depositions during a discovery period that continued for over a year.  The Court reviewed each of Plaintiffs' numerous allegations, arguments, and every page of cited testimony, and with this Order it does not intend to diminish Plaintiffs' experiences.  A concerted effort has been made to eliminate the possibility that among the documents and deposition testimony Plaintiffs amassed, Plaintiffs also collected the component pieces for one or more claims of discrimination against the City.  But it is not for the Court, as a neutral arbiter, to assemble Plaintiffs' claims for them.  At the summary judgment stage of any lawsuit, the plaintiffs' counsel has the responsibility of presenting the plaintiffs' arguments in a coherent manner and supporting these arguments with evidence.  Plaintiffs' counsel has not done so in this case.

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED:**

1. Defendants' Motion for Summary Judgment [Docket No. 57] is **GRANTED**;

2. All claims in the Amended Complaint [Docket No. 4] are **DISMISSED WITH PREJUDICE;**

3. Plaintiffs' Motion to Strike and Supplement the Record [Docket No. 85] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  December 12, 2012.